239 Cal.App.2d 401 (1966)
In re DOROTHY LOIS DUDLEY, a Mentally Deficient Person. FANNIE W. PETTEBONE, Plaintiff and Respondent,
v.
COUNTY OF ALAMEDA, Defendant and Appellant.
Civ. No. 22407. 
California Court of Appeals. First Dist., Div. One. 
Jan. 18, 1966.
 J. F. Coakley, District Attorney, R. Robert Hunter, Assistant District Attorney, Ben H. Zuppan and William A. Hirst, Deputy District Attorneys, for Appellant.
 Barrett, Ferenz & Trapp and Walter S. Ferenz for Respondent.
 SIMS, J.
 The County of Alameda has appealed from an order of the superior court which vacated that portion of an order committing respondent's daughter to the Department of Mental Hygiene for placement in Sonoma State Home as a mentally deficient person, which provided that respondent pay $20 per month to the county on account of the daughter's care, support and maintenance while she was so committed.
 [1] Respondent contended below and the superior court found that the provisions of section 5260 of the Welfare and Institutions Code [fn. 1] are unconstitutional for the same reasons the provisions of section 6650 of that code were found to be unconstitutional in Department of Mental Hygiene v. Kirchner (1964) 60 Cal.2d 716 [36 Cal.Rptr. 488, 388 P.2d 720] (cert. granted (1964) 379 U.S. 811 [85 S.Ct. 39, 13 L.Ed.2d 26], remanded for further proceedings (1965) 380 U.S. 194 *403 [85 S.Ct. 871, 13 L.Ed.2d 753], and reiterated solely on state constitutional grounds (1965) 62 Cal.2d 586 [43 Cal.Rptr. 329, 400 P.2d 321]).
 For the reasons hereinafter set forth it is concluded that the decision in Kirchner does not control the statute in question and its application to the factual situation of this case; and that the law properly requires contribution, within his ability to pay, from a person otherwise responsible for the care of a mentally deficient person.
 The Facts
 The proceedings in which this controversy arises were antedated by similar proceedings which were commenced by a petition filed by respondent, pursuant to the provisions of chapter 2, part 1, division VI ( 5250- 5265 [fn. 2]) of the Welfare and Institutions Code. In this petition, executed April 8, 1940, petitioner alleged that her daughter, then aged 18, was in need of closer supervision than she could give her; that she had evaded supervision, left her home and was criminally assaulted, and had been classified as an imbecile by a psychologist. Respondent sought an order committing her daughter to Sonoma State Home, and providing for the payment of the expenses of the proceeding and of the delivery and care of her daughter in the institution as provided in the aforementioned chapter. At a hearing on April 12, 1940, the court found that respondent's daughter was a feeble-minded person, and ordered that she be committed to a state home and that respondent pay $15 each month to the treasurer of Alameda County for the costs of the care, support and maintenance of her daughter while committed to and confined in the state home. *404
 The confinement pursuant to the former commitment apparently terminated at some time prior to August 12, 1952. On that date respondent executed a new petition which contained the following recitals: that she was charged with the support of her daughter; that her daughter was a mentally deficient person; [fn. 3] that in 1940 she had been found to be mentally defective and had been committed to and accepted by Sonoma State Home; that she was in need of constant supervision for her own protection as well as the protection of the neighbors in that she had suicidal tendencies; that medical and psychological services which had been sought concurred in the diagnosis of "Mental Deficiency"; that the mother was urging her reinstitutionalization as a mental defective; and that the Sonoma State Home concurred and was willing to accept her immediately. After proceedings regularly taken to that end, the court on August 18, 1952, signed its "Findings of Fact, Order for Payment of Support, and Commitment," wherein and whereby the daughter was found to be a mentally deficient person and committed to Sonoma State Home, and respondent was ordered to pay to the treasurer of the County of Alameda the sum of $20 each month for the costs of the care, support and maintenance of her daughter while so committed and confined.
 On March 26, 1964, respondent filed her petition to vacate that portion of the order requiring her to make the monthly payments on the ground that it was null, void and unconstitutional. After a hearing, the court on May 21, 1964, made and filed its written order granting respondent the relief she sought, and this appeal ensued.
 Respondent categorically states: "The Kirchner case, supra, has determined that a parent, guardian, or person charged with the support of mentally ill persons cannot be required by the State to contribute to the support and maintenance of a mentally ill patient committed to a State institution." She asserts that there is no legal or factual difference between mental illness or insanity, on the one hand, and mental deficiency or mental retardation on the other, and expressly points out that the public concern and the interests of society, not only in protecting itself, but in ameliorating the effects of the condition are the same in both instances. *405 From these premises she asks this court to follow the lead of the lower court and rule that section 5260 is unconstitutional.
 The decision in the Kirchner case under any interpretation is not as broad as respondent asserts and it must be examined with more particularity to determine its applicability to the facts presented by this case. Furthermore, although the legal and factual incidents of mental illness and mental deficiency may be similar in many respects, it does not necessarily follow that the Legislature cannot provide a different system of care for persons suffering from the latter than it provides for persons suffering from the former, and in so doing, provide for a different method of financing such care.
 Examination of the provisions of the statute, section 6650, [fn. 4] upon which the state sought to predicate liability in Kirchner, reflects that by its terms it purports to impose a joint and several liability upon the persons and estates of the classes named therein for the care, support and maintenance of a mentally ill person or an inebriate in a state institution. [fn. 5] In Kirchner the state sought to collect from the estate of a deceased daughter the costs of the care, support, maintenance and medical attention which had been supplied to her mother as a mentally ill patient, despite the fact that the patient had a personal estate of $11,000. The opinion presents the issue as follows: "defendant directly challenges the right of a state to statutorily impose liability upon, and collect from, one adult for the cost of supporting another *406 adult whom the state has committed to one of its hospitals for the mentally ill or insane." (60 Cal.2d at p. 718, fn. omitted.) In the course of sustaining this challenge the court relied on Department of Mental Hygiene v. Hawley (1963) 59 Cal.2d 247 [28 Cal.Rptr. 718, 379 P.2d 22], wherein recovery was denied in an action under the provisions of section 6650 to recover from a father for the costs of the care, maintenance and support of his son who had been committed to a state hospital for the mentally ill under the provisions of sections 1368 et seq. of the Penal Code because of his then present insanity. The opinion recites: "Whether the commitment is incidental to an alleged violation of a penal statute, as in Hawley, or is essentially a civil commitment as in the instant case, the purposes of confinement and treatment or care in either case encompass the protection of society from the confined person, and his own protection and possible reclamation as a productive member of the body politic. Hence the cost of maintaining the state institution, including provision of adequate care for its inmates, cannot be arbitrarily charged to one class in the society; such assessment violates the equal protection clause." (60 Cal.2d at p. 720.) The decision reviews cases which had sustained so-called support statutes, and analyzes cases which it states have recognized that neither family relationship, nor blood relationship, nor presence of nor lack of wealth in an individual could furnish, in and of itself, a basis for a valid class discrimination. Note is taken of the social evolution which has brought expanded recognition of the parens patriae principle, of the solicitude for the preservation of the estate of the incompetent for his use in the event of his discharge (see 6655), and of the failure of section 6650 to give a "servient" relative a right of recoupment from assets of the patient. The opinion concludes: "A statute obviously violates the equal protection clause if it selects one particular class of persons for a species of taxation and no rational basis supports such classification. [Citations.] Such a concept for the state's taking of a free man's property manifestly denies him equal protection of the law." (60 Cal.2d at pp. 722-723.) On remand from the United States Supreme Court the state Supreme Court stated its "understanding that the Fourteenth Amendment to the federal Constitution, and sections 11 and 21 of article I of the California Constitution, provide generally equivalent but independent protections in their respective jurisdictions," and concluded that in any event *407 the state constitutional provisions [fn. 6] independently required the result promulgated in the earlier opinion. (62 Cal.2d at p. 588.)
 If Kirchner stands for the proposition that when the state, in the exercise of its promotion of the general welfare, commits a person either for the protection of society or for his protection or rehabilitation, or any combination thereof, it cannot thereafter seek reimbursement except from such person or his estate, that case then is determinative of the matter in issue. [fn. 7] On the other hand, if Kirchner is limited to its facts and does not preclude the state from seeking reimbursement from those otherwise legally responsible for the care, support and maintenance of the person treated, [fn. 8] inquiry must be directed to a determination of whether or not respondent is responsible for the support of her adult daughter; and, if so, whether the state has properly provided for the enforcement of any obligation arising from that responsibility.
 Appellant stresses the Kirchner court's reliance on Hawley and the theory of protection of society and seeks to limit the application of the decision to those mentally ill persons who are defined in subdivision (b) of section 5040 [5550, subd. (b)] [fn. 9] as being "dangerous to themselves or to the *408 person or property of others." It overlooks the court's express reference, quoted above, to "possible reclamation as a productive member of the body politic" (60 Cal.2d at p. 720) as one of the social reasons for holding that the care of such persons is a proper state function, the cost of which cannot arbitrarily be imposed on his relatives by blood or marriage. Appellant also contends that since the law provides for the licensing and control of private institutions which may treat the mentally ill or mentally deficient ( 5699-5754 [6200- 6253]), and since the law recognizes voluntary commitments ( 5265 and 6602 [6050]), the treatment and care of such persons is not exclusively a state function. These considerations do not answer the present inquiry. Kirchner unequivocally holds that where the state commits to a state institution, its principles shall apply. The liability that may be imposed for voluntary treatment, or for treatment in a private institution was not involved in Kirchner and is not involved here.
 [2] The distinction between the class of persons upon whom liability is imposed by section 6650 [same section fn. 4] (Kirchner), and section 5260 [5250] (this case), is significant. Moreover, the former section purports to impose liability, whereas the latter merely prescribes a procedure to enforce what liability for support may otherwise exist. Kirchner does not expressly say that a person otherwise liable for the support of an incompetent is denied equal protection of the law because the state requires him to contribute to the support and maintenance of the dependent while he is receiving treatment from the state. In fact, Kirchner recognizes the liability of the inmate or patient and his estate for his care by emphasizing the language from Hawley so stating. (60 Cal.2d at p. 720; and see: Guardianship of Hicks (1964) 228 Cal.App.2d 629, 632 [39 Cal.Rptr. 698].) Furthermore, from the opinion's analysis of Guardianship of Thrasher (1951) 105 Cal.App.2d 768 [234 P.2d 230], and Estate of Risse (1957) 156 Cal.App.2d 412 [319 P.2d 789] (60 Cal.2d at p. 719), and its failure to qualify the holding of those cases (see id at p. 723), which required the husband to support his wife while she was committed to the state mental hospital even though she had an estate of her own, it may be inferred that it is not a denial of equal protection of the law to provide for payments by a spouse who is otherwise liable for the support of the patient. (See: Note, 12 U.C.L.A. L.Rev. (1965) 605, 609, n. 20; and *409 Schauer, J. dissenting, Department of Mental Hygiene v. McGilvery (1958) 50 Cal.2d 742 at p. 764 [329 P.2d 689].) Similar considerations indicate that it is not unconstitutional to seek repayment from a parent who is otherwise obligated to support a minor child. (Cf. Civ. Code, 196; and see Welf. & Inst. Code, 2576 [now 17300] as interpreted in County of Alameda v. Kaiser (1965) 238 Cal.App.2d 815, 817-818 [48 Cal.Rptr. 343].)
 Section 5260 [5250] suggests inquiry to determine the "person charged with the support of any person committed." In the instant case this inquiry leads to the provisions of section 206 of the Civil Code [fn. 10] which state: "It is the duty of the father, the mother, and the children of any poor person who is unable to maintain himself by work, to maintain such person to the extent of their ability." Under these provisions it has been recognized consistently that a parent is obligated to care for and maintain an adult child who is incapable of supporting himself. (Farber v. Olkon (1953) 40 Cal.2d 503, 509 [254 P.2d 520]; Tuller v. Superior Court (1932) 215 Cal. 352, 355 [10 P.2d 43]; Paxton v. Paxton (1907) 150 Cal. 667 [89 P. 1083], passim; Anderson v. Anderson (1899) 124 Cal. 48, 54-55 [56 P. 630, 57 P. 81, 71 Am.St. Rep. 17]; Woolams v. Woolams (1952) 115 Cal.App.2d 1, 6, and 8 [251 P.2d 392]; Handschy v. Handschy (1939) 32 Cal.App.2d 504, 509 [90 P.2d 123]; State Commission in Lunacy v. Eldridge (1908) 7 Cal.App. 298, 304 [94 P. 597, 600].) "The duty and rights established by section 206 were nonexistent at common law. They were created by legislative mandate as a codification of a moral right, and primarily as a relief to the public." (Radich v. Kruly (1964) 226 Cal.App.2d 683, 686 [38 Cal.Rptr. 340]; and see Department of Mental Hygiene v. Kirchner, supra, 60 Cal.2d 716, 718, fn. 4; Woolams v. Woolams, supra, 115 Cal.App.2d 1, 6; and Britton v. Steinberg (1962) 208 Cal.App.2d 358, 360 [24 Cal.Rptr. 831].) They are the law of this state and have not as yet been declared unconstitutional. *410
 Respondent insists that the principle of section 206 of the Civil Code cannot be relied upon to support the constitutionality of section 5260 [5250] as applied to the parent of an incompetent adult child because of the opinion in County of San Bernardino v. Simmons (1956) 46 Cal.2d 394 [296 P.2d 329]. Therein it is stated: "There is nothing in section 206 which suggests an intention to create a liability of the child of poor parents to public agencies which support the parents in accord with their law-imposed duty to pay aid to such parents; the only liability to third persons is in the case of the promise of an adult child expressly referred to in the last sentence of the section. On the other hand, the Welfare and Institutions Code ... not only purports to state the circumstances in which the named responsible relatives are liable to the county when it has supported or paid aid to indigents, aged, blind, etc., but also states a procedure by which in proper cases the county can recover from the responsible relatives. It seems apparent, therefore, that the Legislature intended, by the Welfare and Institutions Code, to cover completely the subject of recovery by public agencies from responsible relatives, and that it did not intend to create, and that there is no proper basis for the courts to innovate, a right of recoupment derived from section 206 of the Civil Code." (46 Cal.2d at p. 398; fn., which refers to 5260 among others, omitted.) The problem herein, however, is not in determining whether or not appellant can recover in an action brought solely under the provisions of section 206 of the Civil Code, but whether the existence of the liability thereby created demonstrates that it is not a denial of equal protection of the law to require a person subject to that liability to reimburse the county for the care, which in the absence of that furnished by the state and charged to the county ( 7009-7011), [fn. 11] he would otherwise be required to furnish personally. It is recognized that there are strong *411 reasons of social policy for relieving those who have the misfortune of begetting offspring who are feebleminded, mentally deficient or mentally retarded from the economic burdens thereby imposed. [fn. 12] In the absence of arbitrary discrimination or violation of the constitutional rights of the parent, who is otherwise liable for the support of the patient, it does not lie with this court to grant such relief. (See: Beach v. Government of District of Columbia (1963) 320 F.2d 790, 792- 793.)
 In Hawley the state was precluded from obtaining reimbursement from the parent of the cost of care, support and maintenance of his son during a period extending from the latter's minority to past his 24th birthday. It was recognized therein, however, that the son was "held for the primary purpose of protection of the public in the course of administration of laws prohibiting crime" (59 Cal.2d 247, 255). Kirchner, as quoted above, (60 Cal.2d at p. 720) recognizes the obligation of the state to provide care to those civilly committed as mentally ill. (Cf. Estate of Yturburru (1901) 134 Cal. 567, 568-569 [66 P. 729].) It does not expressly in such case restrict the right to recoupment to the inmate, or his estate, but states that the cost may not arbitrarily be charged to one class of persons. Such an arbitrary charge results when liability is imposed on a daughter because of blood relationship alone without regard for the means of the parent patient or the resources of the daughter. In Hawley the state's obligation to care for one charged with crime in jail or prison was transmuted into an obligation to care for the same person in an institution because of his mental illness, and the latter fact gave no warrant to transfer the *412 expense from the state to one who might otherwise be responsible for his support. In Kirchner the court rejected the attempt to shift the cost of the maintenance of the patient from the state and the patient's estate to a relative who except for the arbitrary statute was in no other manner liable for the support of the patient. Herein, on the other hand, the parent, prior to the commitment, was subject to the expense of such care, support, and maintenance as she furnished her daughter. She voluntarily appealed to the state, which in turn assumed her obligations upon terms which included reasonable contribution to the cost thereof. To say that the imposition of this condition is unconstitutional on the one hand is to pave the way for a more restricted program of assistance because of loss of such revenues as are now received not from arbitrary "responsible relatives," but from those "charged with the support of any person committed"; and, on the other hand, is to discriminate against those parents and families who are burdened with a child of the nature under consideration, but because of crowded institutions, or marginal adaptability, are required to keep and provide support, care and maintenance for the child within the home or in a private institution at their own expense.
 [3] The residence requirements ( 5251 [5591]); the recognition of the right to refuse admittance to the committed patient when "the institution is already full, or the fund available for its support is exhausted, or, in the opinion of the Department of Mental Hygiene the ... person is not a suitable subject for admission thereto" ( 5258 [5599]); the general object of the institutions ( 7001) [fn. 13]; and the method of county financing ( 5260 [5250], 7009-7011), all distinguish the care, training and education of the mentally deficient not only from the confinement of the criminally insane (Hawley), but also from the state-oriented system of care for the mentally ill ( 5150- 5152 [5200-5202] and 6650-6658, and Kirchner).
 It is difficult to distinguish the financing of the program for the mentally retarded from that of general relief. Section *413 2500 [17000] read: "Every county ... shall relieve and support all incompetent, poor, indigent persons and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, or by their own means, or by State hospitals or other State or private institutions." [4] The state only purports to relieve the indigent, mentally deficient adult to the extent the costs of his care exceed that which state law imposes on the county ( 7009-7011). The amount paid by the county under the last provisions cannot be distinguished logically from other payments required by former section 2500 [17000]. If it be held that the county may not recover from those otherwise liable for the support of the patient to the extent they have the ability to pay ( 5260 [5250]), it may well follow that the general provisions ( 2576-2577 [17300- 17301]) which give the county a right to reimbursement for aid furnished under section 2500 [17000] must also fall. (See: State Commission in Lunacy v. Eldridge, supra, 7 Cal.App. 298, 305.) The extension of Kirchner to this conclusion, in the absence of many of the factors which led to that decision, does not appear warranted on constitutional grounds.
 Such touchstones as Estate of Yturburru, supra, 134 Cal. 567 and Goodall v. Brite (1936) 11 Cal.App.2d 540 [54 P.2d 510], while perhaps dimmed to a state of imperceptability by the overshadowing pronouncements of Kirchner, have not as yet been relegated to the limbo of overruled principles. In the former case, which upholds the constitutionality of the unquestioned right to impose liability on the patient's estate, the opinion recites: "The contention of appellant based on the theory that these hospitals are charitable and eleemosynary institutions, and should not be converted into boarding-houses, finds a ready answer. It is as necessary to have institutions for the restraint of the insane, whether they be rich or poor, as it is to have prisons and almshouses; and these institutions for the insane are charitable only so far as the legislature makes them so. There is nothing in the constitution inhibiting laws extending charity to people in need of it; but it is not necessary to extend charity to those who are able to support themselves; indeed, it would be unreasonable to do so."
 "A law in effect requiring that patients at the hospitals for the insane shall be there supported out of their own *414 estates is wise and reasonable, and does not come within any inhibition of the constitution against class legislation. The law, on the contrary, is general in its application, and recognizes no classification except such as in the very nature of things necessarily exists, and cannot be disregarded. We presume that every state in the Union has its 'poor laws,' under which the poor and needy, whether they are decrepit, sick, or insane, find protection and support. Of course, those having means for their own support are not admitted to the benefits of these laws. The distinction between the helpless and those able to help themselves is a natural one, and, so far as we are informed, pervades the laws of all civilized countries." (134 Cal. at pp. 568-569.) In support of its conclusion the court notes the obligation of the husband to support his indigent wife while a patient as such obligation was recognized in Watt v. Smith (1891) 89 Cal. 602, 604 [26 P. 1071]. [5] So it may be inferred that a parental obligation coupled with ability to support would render the patient one "having means" for his own support from whom charges could be constitutionally levied.
 In the Goodall case the opinion states: "The preservation of the health and general welfare of the citizens of the county is a question of the prevention and cure of disease generally, and not the accomplishment of these ends by any particular means or in any particular institution. We, therefore, conclude that the admission and treatment of patients in the county hospital who, either themselves or through legally responsible relatives, can provide themselves with equally efficient care and treatment in private institutions does not promote the health and general welfare of the citizens of Kern County and is not a proper exercise of the police power of that county and results in the use of public money for private purposes." (11 Cal.App.2d 547-548.) In respect of those who can furnish partial payment the court added: "When a board of supervisors is given management of a county hospital that body is given the power to adopt rules for the admission of patients, provided, of course, that it must admit those entitled by law to enter and cannot admit those whose reception is prohibited by law of the Constitution. In its rules of admission it should have the power to provide for the payment for care by those not financially able to secure hospitalization in a private institution, the amount to be paid to be determined in its maximum by the cost to the county of hospitalization of each individual *415 patient and charged to the patient on his ability to pay. In the administration of public funds the supervisors are acting as trustees and they should so administer those funds as to lighten the taxpayers' burden as much as possible." (11 Cal.App.2d 550-551.)
 These latter considerations are of course not necessarily applicable in the situation presented by Hawley, but it may be assumed that they should be applied to a person committed, as in Kirchner, if he had ample estate of his own. In other words, it would be a gift of public money to furnish institutional care, support and treatment to a person of means without securing recompense from his estate. Where the patient is indigent himself but is entitled to support from another the same considerations should apply to the release of that person from the obligation he would otherwise bear. Is it not a gift to the wealthy parent to shift a portion of the obligation to support his minor mentally retarded child from him to the taxpayers of the county of the child's residence? If so, neither he, nor the parent of an indigent mentally retarded adult child, who under the provisions of section 5260 [5250] has been found to be charged with, and able to pay a portion of the support of such child should receive such benefaction from the county.
 The order is reversed.
 Sullivan, P. J., and Molinari, J., concurred.
 "The court shall designate some county officer to keep a record of such payments ordered to be made, to receive, receipt for, and record such payments made, to pay over such payments to the county treasurer, to see that the persons ordered to make such payments comply with such orders, and to report to the court any failure on the part of such persons to make such payments." (By 1965 revisions to the Welfare and Institutions Code the foregoing provisions were transferred to section 5250, Statutes 1965, chapter 391, page 1638, effective May 25, 1965.)
NOTES
[fn. 1] 1. Welfare and Institutions Code section 5260 provided at all times material herein as follows: "The court shall inquire into the financial condition of the parent, guardian, or other person charged with the support of any person committed, and if it finds him able to do so, in whole or in part, it shall make a further order, requiring him to pay, to the extent the court considers him able to pay, the expenses of the proceedings in connection with the investigation, detention, and commitment of the person committed, and the expenses of his delivery to the institution, and to pay to the county, at stated periods, such sums as the court deems proper, during such time as the person remains in the institution. ... This order may be enforced by such further orders as the court deems necessary, and may be varied, altered, or revoked in its discretion.
[fn. 2] 2. All section references hereinafter set forth are to sections of the Welfare and Institutions Code as it read prior to May 25, 1965, unless otherwise noted.
[fn. 3] 3. The nomenclature of chapter 2, part 1, of division VI of the Welfare and Institutions Code was changed by Statutes 1945, chapter 137, section 1, page 622.
[fn. 4] 4. Welfare and Institutions Code section 6650 then provided: "The husband, wife, father, mother, or children of a mentally ill person or inebriate, the estates of such persons, and the guardian and administrator of the estate of such mentally ill person or inebriate, shall cause him to be properly and suitably cared for and maintained, and shall pay the costs and charges of his transportation to a state institution for the mentally ill or inebriates. The husband, wife, father, mother, or children of a mentally ill person or inebriate, and the administrators of their estates, and the estate of such mentally ill person or inebriate, shall be liable for his care, support, and maintenance in a state institution of which he is an inmate. The liability of such persons and estates shall be a joint and several liability, and such liability shall exist whether the mentally ill person or inebriate has become an inmate of a state institution pursuant to the provisions of this code or pursuant to the provisions of Sections 1026, 1368, 1369, 1370, and 1372 of the Penal Code." (By Statutes 1965, chapter 1797, section 31, the section was amended to substitute "patient" for "inmate" in the two places the latter word was used.)
[fn. 5] 5. Section 6651 provides for fixing the charges for such care, and sections 6652 and 6658 give the Department of Mental Hygiene the authority to collect and enforce the liability imposed by section 6650.
[fn. 6] 6. The provisions referred to read as follows: "Sec. 11. All laws of a general nature shall have a uniform operation." "Sec. 21. No special privileges or immunities shall ever be granted which may not be altered, revoked, or repealed by the Legislature; nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens."
[fn. 7] 7. See: Department of Mental Hygiene of Cal. v. Judd (1965) 45 N.J. 46 [211 A.2d 198]; Ten Brock, California's Dual System of Family Law: Its Origin, Development, and Present Status (1964) 16 Stan.L.Rev. 257, 900, and (1965) 17 idem 614 at pp. 638-646; Notes, 38 So.Cal.L.Rev. (1965) 355. It must be acknowledged that the author of Kirchner would not limit its pronouncements to the facts of that case--patient with assets, liability imposed on relative without consideration of latter's ability to pay, and failure to give the relative a right of recoupment. This conclusion is evidenced not only by the broad statements in that opinion, but also by his views as expressed in dissenting opinion in Department of Mental Hygiene v. McGilvery (1958) 50 Cal.2d 742, 761-768 at pages 765-767 [329 P.2d 689], and see: Beatty, C.J. dissenting in State Commission in Lunacy v. Eldridge (1908) 7 Cal.App. 298, 307-308 [94 P. 597, 600].
[fn. 8] 8. See criticism of Kirchner: Note, 77 Harv.L.Rev. (1964) 1523; Note, 16 Hastings L.J. (1964) 129; Note, 49 Cornell L.Quarterly (1964) 516; Note, 39 Notre Dame Lawyer (1964) 723; Comment, 39 N.Y. Univ. L.Rev. (1964) 858; Note, 12 U.C.L.A. L.Rev. (1965) 605; and note issues presented to District Court of Appeal in Kirchner (1963, Cal.App.) 29 Cal.Rptr. 312, 315.
[fn. 9] 9. References in brackets are to 1965 revisions.
[fn. 10] 10. Although it may be suggested that section 5260 [5250] refers to the liability created by the provisions of impeached section 6650, the latter by its terms is limited to relatives of "a mentally ill person or inebriate" and is found in a different chapter from that dealing with institutions for the mentally deficient. (Cf. 6500- 6762, and particularly 6500, with 7000-7015, particularly 7000.) In view of the requirement of reimbursement to the county, section 2576 [17300], which is hereinafter discussed, would appear to contain the provisions of the Welfare and Institutions Code which are more pertinent to the situation at hand.
[fn. 11] 11. The above sections were amended by Stats. 1965, chapter 263, section 21; Stats. 1963, chapter 1913, sections 23 and 24; and Stats. 1965, chapter 1797, section 55 which changed "mentally deficient" to "mentally retarded", which recognized that the county was paying only a portion of the charges, and which changed the manner of charging the county. More significantly, section 7011.5 was added to provide expressly for reimbursement to the state of the costs in excess of those payable by the county from the patient and his estate, but with a recital: "This section shall not be construed to impose any liability on the parents of mentally deficient persons." (Stats. 1963, ch. 1913, 25.) As noted above, however, the provisions formerly in section 5260 for reimbursement of the county were retained in new section 5250.
[fn. 12] 12. The public concern in the problem is manifested by President's Panel on Mental Retardation, A Proposed Program for National Action to Combat Mental Retardation (1962); Message from the President of the United States on Mental Illiness and Mental Retardation, February 5, 1963, 88th Congress, First Session, House of Representatives, Document No. 58; and the establishment of the Legislature of the Study Commission on Mental Retardation (Stats. 1963, ch. 935, 1, as amended; Welf. & Inst. Code, 7600- 7609, and see laws collected in Mental Retardation and the Law published by the commission July 1964, and report of the commission entitled The Undeveloped Resource and published Jan. 1965). This public concern, however, does not demonstrate or require that existing private resources which are available to assist in combating the problem should be abandoned. (See: Op. cit., pages 75-85, section IX, particularly pages 79 and 81. The use of resources available to the retarded person as an individual, including a contribution from his family is recognized, but it is suggested that parental obligation cease when the retarded person reaches age 21.)
[fn. 13] 13. Section 7001 provided, and provides, as follows: "The object of each home is such care, training, and education of the persons committed thereto as will render them more comfortable and happy and better fitted to care for and support themselves. To this end the Department of Mental Hygiene shall furnish them with such agricultural and mechanical education as they are capable of receiving and that the facilities offered by the State allow, including farm work, shops, and the employment of trade teachers."