[No. A046065. First Dist., Div. Four. Sept. 27, 1990.]

DEPARTMENT OF DEVELOPMENTAL SERVICES, Plaintiff and Respondent, v.
GLORIA BEALE LADD et al., Defendants and Appellants.

COUNSEL

Wright & Boudett and John L. Boudett for Defendants and Appellants.

Latham & Watkins, William J. Meeske, Michael Scott Feeley and Michael G. Romey as Amici Curiae on behalf of Defendants and Appellants.

John K. Van de Kamp, Attorney General, Stephanie Wald and John C. Porter, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ANDERSON, P. J.—In this declaratory relief action the parties ask whether the state may constitutionally charge a state hospital patient for the cost of the patient's institutional care, support and maintenance following com-

mitment pursuant to Penal Code section 1026.[1] At issue is the fairness and rationality of a statutory scheme which does not separate out protective costs from other costs of institutional care, and which holds certain groups of patients liable for their care while exempting others. Pursuant to this statutory scheme the trial court declared the state was entitled to reimbursement for the costs of support for a mental inmate who was involuntarily confined subsequent to being found not guilty by reason of insanity for the killing of her two sons. (Her estate consisted chiefly of her inheritance from her sons.) We conclude that the legislation does not violate state or federal equal protection principles and affirm.

## I.  Background

In 1975 Gloria Beale Ladd killed her two teenage sons. After finding that she was insane at the time of the killings and had not recovered her sanity, the court rendered judgment committing her to Patton State Hospital for treatment. The state later transferred Ladd to Napa State Hospital, her present placement.

Several years later this court held that former Probate Code section 258, which prohibited a person who unlawfully and intentionally caused the death of a decedent from succeeding to any portion of the decedent's estate, did not bar Ladd from inheriting her sons' estates. (*Estate of Ladd* (1979) 91 Cal.App.3d 219 [153 Cal.Rptr. 888].) The superior court then appointed appellant David Plank as trustee of a blocked account which presently holds approximately $100,000.

In 1984 the Department of Developmental Services (Department) filed a complaint seeking to recoup from the account funds expended for Ladd's care, support and maintenance in the state institutions. In its third amended complaint the Department abandoned its demand for immediate payment and asked for declaratory judgment on the constitutionality of Welfare and Institutions Code[2] section 7275 insofar as it holds a patient committed to a state hospital pursuant to Penal Code section 1026 responsible for the costs of his or her institutional care, support and maintenance. The court entered judgment declaring section 7275 constitutional to that extent.

---

[1] Penal Code section 1026, subdivision (a), provides, in part, that upon a verdict or finding that a defendant "was insane at the time the offense was committed, the court, unless it shall appear to the court that the sanity of the defendant has been recovered fully, shall direct that the defendant be confined in a state hospital for the care and treatment of the mentally disordered or any other appropriate public or private treatment facility . . . ."

[2] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

## II. Discussion

Appellants, assisted by the briefing of amicus curiae Mental Health Advocacy Services, attack section 7275 on two grounds. First, they claim that under California Supreme Court authority, no one class of individuals may be taxed with institutional costs associated with the protection of society, and section 7275 does not separate out these impermissible costs from other care and maintenance expenses. Second, they assert that the law arbitrarily imposes a special financial burden—namely, the cost of institutional care and treatment—on the class of persons found not guilty by reason of insanity and committed to mental institutions. Since, they argue, the law does not require the similarly situated class of inmates committed to state prison who are later transferred to state hospitals to shoulder the cost of care and treatment, section 7275 cannot withstand equal protection scrutiny. We hold there is no constitutional impediment to charging Penal Code section 1026 patients for their *own* care, and further resolve there is a rational basis for treating these patients differently from their convicted, then transferred, fellow patients.

### A.  Charging Patients for Institutional Care

In finding section 7275[3] constitutional, the trial court explained: "The constitutionality of Welfare and Institutions Code section 7275 has been previously ruled upon by this court insofar as it provides for patient liability. See *Guardianship of Gridley* (1973) 32 CA 3d 1053 at 1057-58 for a summary of the interpretations of the law." *Gridley* involved an appeal from a judgment ordering the patient's guardian to pay a specified sum from the assets of the patient's estate for her care at Napa State Hospital. He attacked the proceedings on the basis that he was denied a hearing on the reasonableness of the charges.

In resolving the appeal, the court alluded to the relevant law concerning patient liability: "So far as is material here, the law provides that the estate of a patient in a state hospital for the mentally disordered shall be liable for

---

[3]Section 7275 reads in pertinent part: "The husband, wife, father, mother, or children of a patient in a state hospital for the mentally disordered, the estates of such persons, and the guardian or conservator and administrator of the estate of such patient shall cause him to be properly and suitably cared for and maintained, and shall pay the costs and charges of his transportation to a state institution. The husband, wife, father, mother, or children of a patient in a state hospital for the mentally disordered and the administrators of their estates, and the estate of such person shall be liable for his care, support, and maintenance in a state institution of which he is a patient. The liability of such persons and estates shall be a joint and several liability, and such liability shall exist whether the person has become a patient of a state institution pursuant to the provisions of this code or pursuant to the provisions of Sections 1026, 1368, 1369, 1370, and 1372 of the Penal Code."

his care, support and maintenance in the state institution of which he is a patient. [Citations.] In *Guardianship of Hicks* . . . the court stated, 'The liability of the estate of the incompetent for the charges made for her care at the state hospital is a statutory one and is unconditional . . . . When the Supreme Court, in *Department of Mental Hygiene* v. *Kirchner* [1964] 60 Cal.2d 716 . . . decided that the statutes imposing liability for cost of care of an incompetent upon certain relatives are unconstitutional, it made a distinction, as it had in *Department of Mental Hygiene* v. *Hawley* [1963] 59 Cal.2d 247 . . . of the liability of relatives from liability of the estate, and did not overrule the *McGilvery* case insofar as the latter held the estate liability to be unconditional . . . .' " (*Guardianship of Gridley* (1973) 32 Cal.App.3d 1053, 1057-1058 [108 Cal.Rptr. 200].)

Appellants insist that the lower court's exclusive reliance on *Gridley* ignored the "protection of society" arguments which they advanced, and is not a valid summary of the law in light of the recent California Supreme Court opinions in *In re Jerald C.* (1984) 36 Cal.3d 1.[201 Cal.Rptr. 342, 678 P.2d 917], and *County of San Mateo* v. *Dell J.* (1988) 46 Cal.3d 1236 [252 Cal.Rptr. 478, 762 P.2d 1202]. They claim *Gridley* is "outdated authority" for distinguishing between estates of patients committed under Penal Code section 1026 and their relatives.

We begin our review by examining the rationale of *Hawley* and *Kirchner*, and then move on to discuss the more recent holdings in *Jerald C.* and *Dell J.*

### (1)   *Hawley, Kirchner and Progeny*

Over the years the courts have whittled away at the liability designated under section 7275. As applied to relatives of a defendant charged with a crime but deemed not competent to stand trial, our Supreme Court has said such relatives are not liable for the costs of support and maintenance while the accused is detained at a state hospital for treatment pursuant to Penal Code section 1368 et seq. (*Department of Mental Hygiene* v. *Hawley* (1963) 59 Cal.2d 247, 251 [28 Cal.Rptr. 718, 379 P.2d 22].)

The court reasoned that a person committed to a state hospital under either Penal Code section 1026 or section 1368 et seq. "is held for the primary purpose of protection of the public in the course of administration of laws prohibiting crime." (*Department of Mental Hygiene* v. *Hawley, supra*, 59 Cal.2d at p. 255.) In the court's opinion, since the sequestration and treatment of persons who are dangerous to themselves or others is a state function, the expense of providing, operating and maintaining such institutions should, subject to reasonable exceptions against the inmate or

his or her estate, be borne by the state. The court went on to state that the authority relied upon by the plaintiff involved liability of the estate of the accused pursuant to a Penal Code section 1026 commitment rather than that of "so-called" responsible relatives. (*Id.*, at pp. 255-256.)

Similarly, the next year the Supreme Court held that the reasoning of *Hawley* equally applied to the relatives of a patient civilly committed to a state hospital. (*Dept. of Mental Hygiene* v. *Kirchner* (1964) 60 Cal.2d 716, 720 [36 Cal.Rptr. 488, 388 P.2d 720, 20 A.L.R.3d 353], remanded at (1965) 380 U.S. 194 [85 S.Ct. 871, 13 L.Ed.2d 753], sub. opn. (1965) 62 Cal.2d 586 [43 Cal.Rptr. 329, 400 P.2d 321].) There the Department sought to recover from the estate of decedent daughter for the institutional care of her mother.

The court began its analysis by pointing out that at common law there was no liability on a child to support his or her parents, or on parents to support an adult child. (*Dept. of Mental Hygiene* v. *Kirchner, supra,* 60 Cal.2d at p. 718, fn. 4.) The court further reasoned that the purposes of confinement and treatment of a civilly committed patient encompass the protection of society from that person, as well as his or her "own protection and possible reclamation as a productive member of the body politic. Hence the cost of maintaining the state institution, including provision of adequate care for its inmates, cannot be arbitrarily charged to one class in the society; such assessment violates the equal protection clause." (*Id.*, at p. 720.) Finally, crucial to this holding was the fact that the operative statute imposed absolute liability on servient relatives, without considering the patient's own assets and ability to pay, or giving the relative a right of recoupment against the patient.

Subsequently, reviewing courts have limited *Kirchner* to its facts, namely, the state's attempt to impose liability on one adult for the care of another adult whom the state has institutionalized, where there was no preexisting duty of support. For example, in *Guardianship of Hicks* (1964) 228 Cal.App.2d 629, 632 [39 Cal.Rptr. 698], the court upheld an equitable lien against the incompetent's estate for the entire amount of charges for her care at a state hospital, pointing out that *Kirchner* distinguished the liability of relatives from the liability of the estate. (See also *Estate of Preston* (1966) 243 Cal.App.2d 803 [52 Cal.Rptr. 790].) So, too, in *Department of Mental Hygiene* v. *Kolts* (1966) 247 Cal.App.2d 154, 162-165 [55 Cal.Rptr. 437], the court held there was no denial of equal protection in requiring a husband to pay for the care of his institutionalized wife because the statute did not create a liability in the husband that did not otherwise exist.

### (2) *Jerald C. and Dell J.*

The *Hawley-Kirchner* "protection of society" concept resurfaced years later in two Supreme Court cases determining the constitutionality of the

applicable version of section 903, which at all times has specified which persons are liable for the support of juvenile wards placed by the juvenile court in a county or community facility, and the extent of that liability.

The statute governing the proceedings in *In re Jerald C., supra*, 36 Cal.3d 1, held the parents (and other specified persons) responsible for the cost of the minor's "care, support, and maintenance" (at p. 5) while in the alternative placement. The court struck down this version of the statute, both the majority and lead authors[4] agreeing that under *Kirchner* equal protection principles, the state cannot validly burden one small segment of society with the protective costs of maintaining juvenile wards in county facilities. (*Id.*, at pp. 11-14.)

The Legislature then rewrote the statute, holding only the parents, their estate, and the estate of the minor responsible for the "reasonable costs of support" of the minor when placed or detained in any institution pursuant to juvenile court order. The new statute placed the burden on the county to demonstrate that the "charges exclude any costs of incarceration, treatment, or supervision for the protection of society and the minor and the rehabilitation of the minor." (§ 903, subd. (b).)

*County of San Mateo* v. *Dell J., supra*, 46 Cal.3d 1236 involved a reimbursement order under the new statute which covered only a portion of the actual costs of the minor's support and maintenance in a nonsecure group foster home. The county did not assess any charges for costs of confinement, treatment, supervision or rehabilitation and the trial court considered the parent's ability to pay before rendering judgment.

The court concluded this order was valid. In reaching this conclusion it also affirmed that equal protection principles preclude a statutory scheme from saddling one class of responsible relatives with the costs of confinement, treatment, rehabilitation and supervision of a dependent "whose custody is removed from the family, voluntarily or pursuant to court order, in whole or in part for the benefit and protection of society." (*County of San Mateo* v. *Dell J., supra*, 46 Cal.3d at p. 1252.) The court went on to explain that where there is a preexisting legal duty to support another, the state may seek reimbursement from the responsible family members for the reasonable costs of support and maintenance outside the family home "where such uniform costs can be identified and segregated out from nonallowable costs . . . ." (*Ibid.*)

■ Appellants insist that section 7275 should fall under *Jerald C.* and *Dell J.* analysis because the statute does not segregate "impermissible" costs

---

[4] Three justices signed the "lead" opinion, while four signed a "concurring" opinion which cast the lead opinion as painted with "too broad a brush." (*Id.*, at p. 11.)

of protecting society from the "permissible" costs of support and maintenance. This argument ignores the crucial difference that here the state is trying to recover *from the patient herself* the actual costs of her institutional care and treatment. The concern about spreading the costs of protecting society takes on a different aspect when the inquiry focuses on patient liability.

First, as recently pointed out in *Dell J.*, " ' . . . *Kirchner* recognizes the liability of the inmate or patient and his estate for his care by emphasizing the language from *Hawley* [citation] so stating.' " (*County of San Mateo* v. *Dell J., supra*, 46 Cal.3d at p. 1251, quoting *In re Dudley* (1966) 239 Cal.App.2d 401, 408 [48 Cal.Rptr. 790].) The fundamental equal protection concern in *Kirchner* was the arbitrary shifting of the cost of maintaining a patient at a state hospital from the state and the patient's estate to a relative not otherwise obligated for the patient's support. No California case has ever held that the *patient* should not be charged for his or her hospital care and treatment. In fact, an early California Supreme Court opinion said this about so charging the patient: "A law[5] in effect requiring that patients at the hospitals for the insane shall be there supported out of their own estates is wise and reasonable, and does not come within any inhibition of the constitution against class legislation . . . . [¶] It is not double taxation, nor taxation at all, to require a man to be supported out of his own estate. The money ordered paid herein is for the maintenance of the patient. It goes to the support of the hospital, only because of the presence of the patient therein." (*Id.*, at pp. 568-569.)

Second, while it is obvious that confining a person acquitted under Penal Code section 1026 in a state hospital serves to protect society from that person's unreasonable acts and impulses, this sequestration likewise serves the patient by providing a setting for delivering treatment and services which may assist him or her towards mental health. The primary purpose of the state hospital system is to provide for the care, treatment and education of its mentally disordered patients. (§§ 4304, 7200.) Of significance is the post-*Hawley* and *Kirchner* legislative declaration that mentally disordered persons—regardless of their path to the institution—should be regarded as patients rather than inmates. Section 4132, operative July 1, 1969,[6] provides: "It is hereby declared that the provisions of this code reflect the concern of

---

[5] The law in question in *Estate of Yturburru* (1901) 134 Cal. 567 [66 P. 729] was Civil Code section 38 which reads: "A person entirely without understanding has no power to make a contract of any kind, but he is liable for the reasonable value of things furnished to him necessary for his support or the support of his family."

[6] Former section 4132, added by Statutes 1965, chapter 1797, section 2, page 4148, related to the same subject and was repealed by Statutes 1967, chapter 1667, section 34.5, page 4055, operative July 1, 1969. It used the term "mentally ill" rather than "mentally disordered"; in all other respects the wording was identical to the present statute.

the Legislature that mentally disordered persons are to be regarded as patients to be provided care and treatment and not as inmates of institutions for the purposes of secluding them from the rest of the public. [¶] Whenever any provision of this code heretofore or hereafter enacted uses the term 'inmate,' it shall be construed to mean 'patient.' "

While the protection of society concept makes sense and is dispositive when the issue is charging one person for the care of another, it becomes insignificant when the issue is charging a mentally ill patient for his or her own care, particularly in light of the legislative intent expressed in section 4132. We must not forget that the equal protection rationale of *Jerald C.* and *Dell. J.* is rooted in the parent-child relationship. ■ Regardless of whether a child is a section 602 ward or not, the law has always required parents to furnish basic support for their children. But this bedrock support duty does not encompass a specific obligation to pay special costs which arise when a child is removed from the family "in whole or in part for the benefit or protection of society." (*County of San Mateo* v. *Dell J., supra*, 46 Cal.3d at p. 1252.) To force parents to absorb the extra costs relating to confinement, treatment, rehabilitation and supervision when their child has engaged in criminal conduct resulting in a section 602 wardship is unfair because the parents would end up underwriting the state's function of protecting society.

■ In contrast, the services and treatment rendered and charged to the Penal Code section 1026 patient above and beyond minimum support costs principally benefit the individual patient, notwithstanding a simultaneous benefit to the public. But for the Penal Code section 1026 patient's mental illness, there would be no hospitalization and attendant expenses.

Third, we also note that section 4025[7] limits charges for patient care and treatment to the "actual cost thereof as determined by the director in accordance with standard accounting practices." This provision further authorizes the director to include "the amount of expenditures for capital outlay or the interest thereon, or both" when determining actual cost. The statute defines "care" and "care and treatment" as including "care, treatment, support, maintenance, and other services rendered by the department to a patient in the state hospital or other facility maintained by or under the jurisdiction of the department." Thus, while the charges for care and treatment can include the cost of capital expenditures, these charges are for the actual costs of the panoply of services provided the patient in the state hospital.

---

[7] Section 7276 provides that charges for the care and treatment of all mentally disordered persons at state hospitals "for whom there is liability to pay therefor shall be determined pursuant to Section 4025."

Given the purpose and focus of the state hospital system, and the relationship of charges to the actual cost of services, we conclude that assessing the estates of Penal Code section 1026 patients for the costs of institutional care does not arbitrarily shift societal costs to a small segment of the public. The very costs exist only because the state is providing a treatment setting in the state hospital for the benefit of the patient.

## B. *Classification Analysis*

Appellants' next attack centers on standard equal protection analysis concerning the legislative scheme for charging certain mentally disordered persons for their institutional care and exempting others. Appellants claim it is arbitrary for the state to assess Penal Code section 1026 patients for care and maintenance costs while convicted inmates receive the same services free of charge when transferred from prison to a state hospital.

The federal and state Constitutions demand that no person be denied equal protection of the laws. (U.S. Const., Amend. XIV, § 1; Cal. Const., art. I, § 7, subd. (a).) For purposes of this case, the state constitutional safeguard is coextensive with its federal counterpart. These equal protection mandates direct that all persons under similar circumstances shall receive like treatment. (*Plyler* v. *Doe* (1982) 457 U.S. 202, 216 [72 L.Ed.2d 786, 798, 102 S.Ct. 2382]; *In re Eric J.* (1979) 25 Cal.3d 522, 531 [159 Cal.Rptr. 317, 601 P.2d 549].)

When reviewing economic legislation, we will respect the distinctions which the Legislature draws between groups of individuals if the classification is reasonable, not arbitrary, and grounded in some difference having a "rational" relationship to a legitimate government purpose. (*Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1, 8 [39 L.Ed.2d 797, 803-804, 94 S.Ct. 1536].) Our inquiry into the rationality of a classification extends beyond the four corners of any particular statute to embrace all enactments which bear on the state action at issue. (*Brown* v. *Merlo* (1973) 8 Cal.3d 855, 862 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505].)

As we explain, the legislative scheme here is broader than section 7275 and encompasses more than one legislative purpose.

## (1)  *Transfer Statutes*

Penal Code section 2684 provides for transfer of prisoners to state hospitals under specified circumstances,[8] while Penal Code section 2685 spells out the procedures for the reception of prisoners so transferred, as well as their return to prison.[9]

By regulation the Department of Corrections is charged with providing a broad range of mental health services for its inmates, including specialized programs, to the extent of available resources. (Cal. Code Regs., tit. 15, § 3360, subd. (a).) However, if an inmate needs mental health care beyond the scope of these resources, and such care is available in the Departments of Mental Health and Developmental Services, the regulations specify that "the case will be referred to the director for consideration of temporary transfer to those departments pursuant to Section 2684 of the Penal Code." (Cal. Code Regs., tit. 15, § 3360, subd. (b).) Finally, the inmate so transferred to a state hospital is not liable for expenses incurred there: when the Director of Corrections authorizes the temporary removal from prison of an inmate for whatever purpose, he or she may "require the inmate to reimburse the state, in whole or in part, for the expenses incurred by the state in connection with such temporary removal *other than for medical treatment*." (Pen. Code, § 2690, italics added.)

## (2)  *The Payment Scheme is not Irrational*

■ Appellants maintain it is irrational to burden Penal Code section 1026 patients but not transferees with the cost of treatment. They urge us to adopt the reasoning of a Connecticut opinion which held there was no

---

[8] This section reads in part: "If, in the opinion of the Director of Corrections, the rehabilitation of any mentally ill, mentally deficient, or insane person confined in a state prison may be expedited by treatment at any one of the state hospitals under the jurisdiction of the State Department of Mental Health or the State Department of Developmental Services, the Director of Corrections, . . . shall certify that fact to the director of the appropriate department who shall evaluate the prisoner to determine if he would benefit from care and treatment in a state hospital. If the director of the appropriate department so determines, the superintendent of the hospital shall receive the prisoner and keep him until in the opinion of the superintendent such person has been treated to such an extent that he will not benefit from further care and treatment in the state hospital."

[9] This section reads: "Upon the receipt of a prisoner, as herein provided, the superintendent of the state hospital shall notify the Director of Corrections of that fact, giving his name, the date, the prison from which he was received, and from whose hands he was received. When in the opinion of the superintendent the mentally ill, mentally deficient or insane prisoner has been treated to such an extent that such person will not benefit by further care and treatment in the state hospital, the superintendent shall immediately notify the Director of Corrections of that fact. The Director of Corrections shall immediately send for, take and receive the prisoner back into prison. The time passed at the state hospital shall count as part of the prisoner's sentence."

reasonable ground to support a distinction between "insanity acquittees," required by statute to pay for their institutional treatment, and prisoners serving sentences who were transferred to a state hospital, free of treatment charges.

The statute in question in *State* v. *Reed* (1984) 192 Conn. 520 [473 A.2d 775] provided that the state would be charged with the hospital expenses of an inmate transferred from a correctional institution to a state hospital prior to termination of sentence. Under the same legislation, persons committed to a state hospital following an acquittal by reason of insanity were liable for their hospital expenses in the same manner as patients civilly committed.

The Supreme Court of Connecticut declared this statute denied "insanity acquittees" equal protection of the laws. (*State* v. *Reed, supra,* 473 A.2d at p. 781.) The state argued that the policy of the statutory charging scheme was to conserve state funds by holding patients responsible for the expense of treatment to the extent of their ability to pay. The court agreed that there were differences between the two groups in that "insanity acquittees" do not bear the stigma of conviction and cannot be denied their freedom once they are no longer dangerous to themselves or others. However, it reasoned that these obvious differences had no relationship to comparative ability to pay, need for treatment, or any other factor which might reasonably support the classification the legislature chose for charging one group but not the other. Given the legislative purpose, the court concluded it was inconsistent to create an exception for prisoners serving sentences. (*Id.,* at pp. 780-781.)

The Connecticut scheme, like California's, has a payment component and an exemption component. By focussing solely on the payment provisions and their cost-spreading objectives, the court in *Reed* overlooked an equally viable objective of the exclusionary provisions: to provide, at state expense, for the health care of its convicted inmates. A legislature could rationally make the policy decision that once the state has decided to punish a convicted defendant by sending him or her to prison, it will bear the cost of incarceration, including the cost of the inmate's care. In California, the Legislature has vested the Director of Corrections with responsibility for the care and treatment of persons confined in state prisons. (Pen. Code, § 5054.) This care encompasses medical treatment, including mental health services. If in any given situation providing care means sending a mentally disabled prisoner to a state hospital because prison facilities are inadequate, so be it.

The Penal Code section 1026 patient, on the other hand, has not been convicted of a crime and indeed is viewed by the law as not guilty. The

Legislature could rationally conclude that these patients, with less stigma attached to their commitment and a greater chance of freedom at an earlier date,[10] should pay if able. (See *In the Matter of Sargent* (1976) 116 N.H. 77 [354 A.2d 404, 407].)

A United States Court of Appeals recently reached a similar conclusion when comparing persons committed to a state mental health hospital after a verdict of "not guilty by reason of mental disease or defect" (referred to as "mental health acquittees") with all other persons criminally committed. (*Fetterusso v. State of New York* (2d Cir. 1990) 898 F.2d 322.) Under the New York Criminal Procedure Law, mental health acquittees are billed for their institutional care but all other persons receiving services while held pursuant to a criminal court order are not similarly charged; this latter group includes prisoners in need of care for their mental illnesses, as well as persons evaluated to determine fitness to stand trial and those deemed incompetent to stand trial. (*Id.*, at p. 326.)

The court in *Fetterusso* explained that incarcerated prisoners committed to mental health institutions are returned to prison to complete their sentence if no longer mentally ill or in need of special care, and their sentence runs during the period of hospitalizations. It concluded that in this instance as well as the evaluation and incompetency situations, mental health treatment "apparently is ancillary to the return of the patient to the criminal justice system. [¶] In contrast, mental health acquittees are released into the general population upon the restoration of their mental capacity . . . . Their commitment to a secure OMH facility is not in expiation of a crime or in lieu of serving a prison sentence in the custody and at the expense of the state . . . . [¶] Thus, requiring only [mental health acquittees] to pay for services—and not others criminally committed—rationally serves the goal of shifting the cost of psychiatric services to those beneficiaries of the State's treatment who would have remained outside the reach of the criminal justice system but for their combined present mental illness and dangerousness. Because the nature and purpose of committing a dangerous [mental health acquittee] and the standards and consequences of their release differ from others criminally committed, the State is justified in not assuming the financial expense involved in the care and treatment of such patients." (*Id.*, at pp. 326-327, fn. omitted.)

The California statutes cut somewhat differently than the New York provisions—in California, those incompetent to stand trial, like acquittees,

---

[10] The maximum period of commitment to a hospital generally cannot exceed the duration of the maximum sentence for the underlying offense (Pen. Code, § 1026.5, subd. (a) [see subd. (b) for limited circumstances permitting extended commitment]), but the Penal Code section 1026 patient can obtain earlier release upon a showing of restored sanity (Pen. Code, §§ 1026, subd. (b), 1026.1, subd. (a), and 1026.2).

are charged for their care and treatment; only prison transferees are supported by the state.[11] Nonetheless the *Fetterusso* logic has bearing on this case. As in New York, the hospital treatment of a California prisoner-transferee is ancillary to the prison commitment. The hospital stay is temporary, expedited when penal resources are insufficient to meet the prisoner's mental health needs, and terminated when there is no further treatment benefit to be gained. On the other hand, with the Penal Code section 1026 patient the hospital commitment is primary; the criminal laws provide checkpoints for deciding when return to society is appropriate or in limited circumstances when transfer to a corrections institution is warranted.[12]

For purposes of deciding who pays, the statutes in question align the mentally disordered prisoner with all other convicted inmates, and the Penal Code section 1026 patients with all patients admitted directly to the state hospital.[13] This is not a perfect classification scheme. ■ But in applying equal protection principles to an economic regulation, we tolerate a legislature's rough approximations in designing means to serve legitimate public purposes. (*Plyler* v. *Doe, supra,* 457 U.S. at p. 216 [72 L.Ed.2d at p. 799].) Recognizing the practical problems facing elected decisionmakers, courts do not require that groupings be made with " ' "mathematical nicety" ' " (*Vance* v. *Bradley* (1979) 440 U.S. 93, 108 [59 L.Ed.2d 171, 183, 99 S.Ct. 939].) Thus, we will not overturn a statute on equal protection grounds "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." (*Id.,* at p. 97 [59 L.Ed.2d at p. 176].)

■ In sum, there are two legislative ends apparent in the larger statutory framework bearing on this case: (1) distributing the economic burdens

[11] We do not attempt to resolve whether there is an equal protection problem vis-à-vis charging patients hospitalized upon a finding of incompetency to stand trial. From the inception of this lawsuit, appellants have only asked whether the charging scheme is constitutional as it impacts transferees versus acquittees; we restrict our decision to these two groups.

[12] Pursuant to section 7301, the Director of Mental Health has discretion to transfer a Penal Code section 1026 patient when, in the director's opinion and with approval of the Director of Corrections, the patient "needs care and treatment under conditions of custodial security which can be better provided within the Department of Corrections . . . ."

[13] Amicus curiae develops a lengthy argument pointing out the difference between the criteria and procedures for commitment and release of Penal Code section 1026 patients and those governing involuntary civil commitments. (E.g., compare § 5150 et seq. and Pen. Code, §§ 1026-1026.5.) While the differences are apparent, amicus curiae's conclusion that "NGI inmates . . . are not similarly situated to persons civilly committed to state mental hospitals" is largely irrelevant to the equal protection issue here, namely, whether "NGI" patients are similarly situated to prisoners transferred under Penal Code section 2684. As stated in *Fetterusso:* "Our inquiry must focus on whether there is a rational basis for treating [mental health acquittees] differently from other persons criminally committed, not whether requiring them to pay, as civil committees do, is justified." (*Fetterusso* v. *State of N.Y., supra,* 898 F.2d at p. 326.)

of state hospital care, and (2) providing for the care of prisoners upon conviction. These objectives in turn reflect the differences between the two groups with respect to the nature and purpose of commitment and the standards and consequences of release. (See *Fetterusso* v. *State of N.Y., supra,* 898 F.2d at p. 327.)

The transferee at all times is a convicted defendant sentenced to prison for the express purpose of punishment (Pen. Code, § 1170, subd. (a)(1)); his or her state hospital stay is temporary in nature and tangential to the prison commitment. We conclude the Legislature acted rationally when it decided that the hospital expenses incurred by mentally disordered inmate transferees, like all other expenses related to the care and treatment of convicted inmates, should remain a state liability. In contrast, the person acquitted by reason of insanity is institututionalized not for punishment but because of present mental illness, and has some chance of return to society and remunerative employment at an earlier date than an inmate convicted for the same offense. Given these differing characteristics, we also conclude the Legislature was justified in allocating responsibility for the same expenses to the Penal Code section 1026 patient. (See *Fetterusso* v. *State of N.Y., supra,* 898 F.2d at p. 327.) Inmate-transferees and Penal Code section 1026 patients are not similarly circumstanced with respect to the applicable laws and dual legislative policies involved. Accordingly, section 7275 does not run afoul of equal protection principles to the extent it holds the estate of Penal Code section 1026 patients liable for their hospital care.

## C. *Substantive Due Process*

■ Appellants end, in very cursory fashion, with a substantive due process argument. To charge Ladd and other Penal Code section 1026 patients for the cost of their own care and treatment in a state hospital rationally advances the public purpose of spreading the burden of institutional care among its recipients. (See *Woods* v. *Holy Cross Hospital* (5th Cir. 1979) 591 F.2d 1164, 1176.) That the institutionalization of these patients also serves to protect society does not destroy the rationality of the liability provisions.

The judgment is affirmed.

Perley, J., concurred.

POCHÉ, J.—I concur in the conclusion reached by the majority opinion that the state does not deny equal protection of the law to individuals committed to a mental institution upon a finding that they are not guilty by

reason of insanity (Pen. Code, § 1026)[1] when it requires them to pay for their care. For me the question is relatively straightforward.

Ladd contends that she and all section 1026 committees are treated differently from inmates confined in state prisons who are given mental health care in a hospital but are not required to pay for their treatment. The parties concede that the class of section 1026 committees is not a suspect class nor is the requirement they pay for their care a burden upon a fundamental interest. That being so the statute creating the classification is only infirm constitutionally if "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." (*Vance* v. *Bradley* (1979) 440 U.S. 93, 97 [59 L.Ed.2d 171, 176, 99 S.Ct. 939].)

"It is fundamental to our system of jurisprudence that a person cannot be convicted for acts performed while insane." (*People* v. *Kelly* (1973) 10 Cal.3d 565, 574 [111 Cal.Rptr. 171, 516 P.2d 875].) Accordingly we do not subject to penal sanctions those individuals whose acts were criminal if we find them to have lacked the requisite wrongful intent owing to their insanity. (*People* v. *Skinner* (1985) 39 Cal.3d 765, 774 [217 Cal.Rptr. 685, 704 P.2d 752]; § 1026.) Considerations of societal safety and humane treatment underlie the policy of committing individuals found not guilty by reasons of insanity.

In contrast our Legislature has declared that "the purpose of imprisonment for crime is punishment." (§ 1170, subd. (a)(1).) Thus a prison inmate whose physical or mental condition requires hospital care is held to be serving his sentence during such periods of hospitalization. (§ 2685.) It is entirely reasonable that the state may undertake to shoulder the costs of maintaining and supporting those it punishes with a prison sentence. Both the administrative convenience of prison administration and common decency may compel the hospitalization of inmates suffering severe physical or mental illness. (See § 2684.) Nonetheless such inmate-patients are serving time—they have been found culpable for a crime for which they are being punished. Two mental patients in adjacent beds, one a section 1026 committee and one an inmate-patient, are not similarly situated for the purposes of equal protection analysis.

Although appellant urges us to follow the reasoning of *State* v. *Reed* (1984) 192 Conn. 520 [473 A.2d 775], I find the reasoning of that case unpersuasive. Under the Connecticut scheme, like that in this state, individ-

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

uals civilly committed and those found not guilty by reason of insanity were required to pay for their mental care. However, inmates transferred from a prison to a mental hospital were exempt from paying for their care. As an initial matter the court rejected a comparison advanced by the state between individuals who were civil committees and those committed upon a finding of not guilty by reason of insanity. (473 A.2d at p. 780.) Then it went on to compare the relevant groups: the inmate-patients and the so-called insanity acquittees. It found that the differences between the two groups were "not related to comparative financial ability or need for treatment." (*Ibid.*)

As I see it, the Connecticut court focuses upon the wrong interest being served by the classification. The interest at issue is the state's rationale for making the distinction. That rationale in the case before us is first, the punitive reason for confining inmate-patients and second, the administrative convenience of prison management. Such goals are rationally related to the state's distinctions regarding payment. That the lines drawn are not perfect is beside the point. (*Plyler* v. *Doe* (1982) 457 U.S. 202, 216 [72 L.Ed.2d 786, 798-799, 102 S.Ct. 2382].)

Appellants' petition for review by the Supreme Court was denied December 20, 1990. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.