STATE OF CONNECTICUT *v.* SCOTT REED ET AL.
(10947)

PETERS, PARSKEY, SHEA, GRILLO and MENT, Js.

Argued December 8, 1983—decision released April 3, 1984

*Robert E. Quish,* for the appellant (defendant Llewelyn Reed).

*Ann Daniels,* of the New York bar, with whom were *Stephen Wizner, John L. Pottenger, Jr.,* and, on the brief, *Renee D. Chotiner* and *P.J. Pittman,* for the appellant (named defendant).

*Michael A. Arcari,* assistant attorney general, with whom, on the brief, was *Joseph I. Lieberman,* attorney general, for the appellee (plaintiff).

SHEA, J. After the named defendant had been found not guilty of a murder charge by reason of insanity and had been committed to a state mental hospital pursuant to General Statutes § 53a-47 following his acquittal, the state brought this civil action for reimbursement of the cost of his care during the period of his confinement. The trial court rendered judgment for the plaintiff and the defendants[1] have appealed. The authority relied upon by the state and the court is General Statutes § 17-317,[2] which provides that, when a person charged with a criminal offense has been found not guilty because of mental illness and has been committed for confinement or treatment to any institution supported wholly or partly by the state, the expense of such support should be computed and paid for in the same manner as for patients civilly committed by the courts of probate. To the same effect is General Statutes § 53a-47 (h).[3] In their appeal from the judgment the defendants challenge the constitutionality of § 17-317 upon the ground that it arbitrarily and irrationally makes persons, like the defendant Scott Reed, who have been confined after an acquittal by reason of insanity, liable for hospital care expenses while other persons similarly deprived of their liberty, such as prison inmates serving sentences, are not required to pay for such care.

[1] The defendants are Scott Reed, the person for whose care reimbursement is sought, and Llewelyn Reed, the conservator of his estate during a portion of the period of confinement involved.

[2] General Statutes § 17-317 provides as follows: "When any person, charged with any offense punishable by fine or imprisonment or both, has been found not guilty because of mental illness and, by reason of such mental illness, has been committed for confinement or treatment to any institution supported in whole or in part by the state, the expense for the support and treatment of such person while so committed shall be computed and paid for in the same manner as is provided in this chapter for patients committed by courts of probate."

[3] The parties have not referred to General Statutes § 53a-47 (h), which provides: "The expense of confinement, support and treatment of any person confined hereunder shall be computed and paid for in accordance with the provisions of section 17-205a and chapter 308."

We agree with this contention and declare § 17-317, as well as § 53a-47 (h), invalid as violating the "equal protection" clause of the fourteenth amendment to our federal constitution and article first, § 20 of our state constitution. Because this conclusion of error is dispositive and requires a remand with direction to render judgment for the defendants, we do not address the additional claims[4] raised by the defendants in this appeal.

There is no dispute about the facts. On January 15, 1974, the defendant Scott Reed was arrested and confined in connection with a homicide. Because he appeared to be in need of observation and treatment for mental illness, he was sent to the Whiting Forensic Institute in Middletown where he remained until May 23, 1974.[5] A grand jury on February 11, 1974, indicted him for murder. A mental examination was ordered to determine whether Reed was competent to stand trial. He was found competent on May 23, 1974, and then was returned to the New Haven Correctional Center to await trial.

On November 1, 1974, after a trial before a three judge court, Reed was found not guilty because of men-

---

[4] The defendants have pursued two additional claims: (1) that General Statutes §§ 17-295 and 17-295b, which authorize the computation of charges for hospital care on a "cost per capita per diem" basis without relationship to the particular services received by the patient, violate the due process and equal protection clauses of the federal and state constitutions; and (2) that the court should have allowed a set-off to the defendant Scott Reed for some services he performed at Connecticut Valley Hospital under the direction of the staff.

Two further claims which were included in the defendants' brief were withdrawn at oral argument.

[5] This confinement was the subject of the first count of the complaint. A summary judgment, *Hadden, J.,* was rendered for the defendants on this count. The court found no statutory authority to impose charges for hospital care of persons found competent to stand trial but held in detention awaiting trial. Cf. General Statutes § 54-56d (m). The state has not appealed from this judgment.

tal disease or defect and was committed to the Connecticut Valley Hospital (CVH) for a period of ninety days so that he might be examined to determine whether he was "mentally ill to the extent that his release would constitute a danger to himself or others." General Statutes § 53a-47 (a) (1). On April 30, 1975, after a hearing pursuant to § 53a-47 (a) (4), the court determined that Reed was then mentally ill to the extent that his release would create a danger to himself and others and he was ordered to be confined at CVH until he no longer constituted such a danger. The court set a maximum term of twenty-five years, subject to possible further confinement thereafter in accordance with § 53a-47 (d) if he should still be dangerous at that time. The order expressly directed that Reed "not be released from the confines of [CVH] grounds without order of the Court."

While Reed remained at CVH under the orders of confinement he worked without pay as a recreation assistant, supervising patients in such activities as swimming, hiking, camping and spectator sports. On May 1, 1975, the Milford Probate Court appointed the defendant Llewelyn Reed as conservator of the person and estate of Scott Reed. The conservator notified the state department of administrative services that the estate was not liable for the expenses of the confinement of his ward at Whiting Forensic Institute and at CVH.

On June 15, 1976, the court held another hearing in accordance with § 53a-47 (c) and concluded that Scott Reed was then no longer a danger to himself or others. He was ordered to be released, as authorized by § 53a-47 (e) (2), upon conditions which included the requirements that he " 'remain on a voluntary basis at [CVH] until such time as he obtains employment either at the hospital . . . or elsewhere' "; that he remain in the out-patient treatment program at CVH

to be checked at least weekly for a period of one year; that he be placed on probation; and that the court's order be reviewed in one year.

The Probate Court on July 9, 1976, determined that Reed was "restored to his capacity," but did not terminate the conservatorship of his person and estate. On July 21, 1976, Reed was hired as a paid employee at CVH in a position involving duties similar to those he had previously been performing without pay. Two days later, on July 23, 1976, he was discharged from CVH as a patient. On the same day the state instituted this suit to collect patient-care charges for Reed's confinement at CVH from the date of his acquittal by reason of insanity to the date of his discharge.

This litigation is a sequel to a holding of the federal district court that § 17-318, prior to its amendment in 1975, was constitutionally infirm because it arbitrarily exempted those incarcerated in specified state correctional institutions from payment of hospital costs incurred during the period of their sentences, while inmates of community correctional centers had to bear such expenses. *McAuliffe* v. *Carlson,* 377 F. Sup. 896 (D. Conn.), supplemented, 386 F. Sup. 1245 (D. Conn. 1974), rev'd as to monetary damages only, 520 F.2d 1305 (2d Cir. 1975), cert. denied, 427 U.S. 911, 96 S. Ct. 3199, 49 L. Ed. 2d 1203 (1976). Following that decision, the legislature amended § 17-318 to require the state to assume the hospital expenses of persons transferred to a state hospital from community correctional centers as well as those from other prisons. Public Acts 1975, No. 75-416, § 1.

The statutes which imposed liability for the care of persons treated at state hospitals while Reed remained at CVH established the following pattern: Persons who were serving prison sentences and were transferred to a state hospital were not charged during the period

of sentence. General Statutes § 17-318. Pretrial detainees who had been determined to be incompetent to stand trial and had been committed for treatment to the custody of the commissioner of mental health or the commissioner of mental retardation were required to pay for such treatment. General Statutes § 54-56d. Other pretrial detainees, including those charged with crimes and also material witnesses, who had been transferred from a state correctional institution to a hospital were cared for without charge. General Statutes § 17-318. All other persons, including those who had been the subject of a civil commitment by the Probate Court, welfare beneficiaries who had later acquired property, and persons committed pursuant to General Statutes § 53a-47 (a), like Scott Reed, were liable for their care at state hospitals. General Statutes §§ 17-295b, 17-83e.

The defendants' claim that General Statutes § 17-317, which imposes liability for hospital costs on insanity acquittees, violates the equal protection clauses of our federal and state constitutions is based upon their contention that no rational distinction justifying different financial treatment can be made between such persons and ordinary prisoners held in confinement under a court order for the benefit of society whose hospital expenses are borne by the public in accordance with § 17-318. The state, on the other hand, maintains that persons found not guilty by reason of insanity under § 53a-47 (a) (1) may reasonably be treated in the same manner as those who are the subject of a civil commitment by the Probate Court and who must pay for their confinement in a state hospital.

The defendants do not claim that the legislative pattern of liability for hospital costs interferes with fundamental constitutional rights or involves suspect classifications, which would warrant the application of the "strict scrutiny" standard of review of their con-

stitutional challenge and would require the state to demonstrate a "compelling state interest" to justify any disparity in treatment. *San Antonio School District* v. *Rodriguez,* 411 U.S. 1, 16, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973). They agree with the state that the applicable standard is the "rational basis" test: whether there exists any reasonable ground to support the distinction in regard to liability for hospital expenses which the legislature has chosen to make between insanity acquittees and prisoners convicted of crimes. If the difference in treatment "rationally furthers some legitimate, articulated state purpose," it does not constitute an unconstitutional discrimination in violation of the equal protection clause. Id., 17.

"Connecticut undoubtedly has a legitimate interest in relieving its taxpayers by requiring prisoners with earning potential or assets to reimburse the State for the expense of maintaining them in state hospitals." *McAuliffe* v. *Carlson,* supra, 900–901. The decisive issue in this case is whether there is any reasonable basis for finding that such a salutary purpose or any other proper legislative objective is advanced by the distinction which has been made between insanity acquittees of whom § 17-317 requires payment and other prisoners whom § 17-318 exempts from such liability.

The state contends that persons committed to its mental hospitals following an acquittal because of insanity are not prisoners, like those who have been found guilty of a crime and sentenced to prison for the benefit of society, but are essentially similar to persons who have been civilly committed to such institutions by a Probate Court pursuant to General Statutes § 17-178. See *State* v. *Kosiorek,* 5 Conn. Cir. Ct. 542, 259 A.2d 151 (1969). Although we are not overly impressed with the circumstance that the orders confining an insanity acquittee to a hospital emanate from the criminal rather than the civil jurisdiction of the

court, our review discloses several more significant differences. A commitment by a Probate Court under § 17-178 as phrased during the period involved, 1974–1976, required a finding "that the person complained of is mentally ill and a fit subject for treatment in a hospital for mental illness or that he ought to be confined."[6] A sworn certificate of two impartial physicians, one of whom had to be a practicing psychiatrist, was also necessary. A person thus civilly committed could be released at any time without further legal proceedings by the hospital authorities, if they had "reason to believe" that he was "not mentally ill or a suitable subject to be confined in such institution." General Statutes § 17-192.

One who was acquitted by reason of insanity, however, had to be confined in a state mental hospital for a period not to exceed ninety days for the purpose of a mental examination, unless the court could determine from the evidence already before it that he was "not mentally ill to the extent that his release would constitute a danger to himself or others." General Statutes § 53a-47 (a) (1). After the report of the examination was filed with the court, a hearing was necessary to determine whether the acquittee might safely be released. The statute provided: "If the court determines that the preponderance of the evidence at the hearing establishes that such person is mentally ill to the extent that his release would constitute a danger to himself or others, the court shall confine such person in a suitable hospital or other treatment facility." General Statutes § 53a-47 (a) (4). In ordering such confinement the court had to set a maximum period which could not exceed the maximum sentence allowed for a conviction of the offense charged. General Statutes § 53a-47 (b).

---

[6] By an amendment which did not take effect until October 1, 1977, this standard for civil commitment was changed to require a finding that a person was "dangerous to himself or herself or others or gravely disabled." Public Acts 1976, No. 76-227, §§ 3, 7; Public Acts 1977, No. 77-4.

A certification by the hospital superintendent that a person under such a confinement order was no longer mentally ill to the extent that his release would constitute a danger to himself or others did not itself effectuate his release, as in the case of a civil commitment, but merely authorized the court to order such release upon the expiration of thirty days from the filing of the certificate. General Statutes § 53a-47 (c) (1). The state during this period could request a hearing upon the propriety of such release, where it would have the burden of establishing by a preponderance of the evidence that the acquittee was still mentally ill to the extent that his release would endanger himself or others. General Statutes § 53a-47 (c) (2). Even after the expiration of the maximum period of commitment, the state might obtain further confinement by proving that continued confinement was warranted because of mental illness to such extent that "release would constitute a danger to life or person." General Statutes § 53a-47 (d).

There are significant differences in the statutory standards for commitment and release of those confined under an order of a Probate Court and those who were the subject of a mittimus issued by a criminal court. In the noncriminal setting a finding that a person was "mentally ill and a fit subject for treatment in a hospital for mental illness or that he ought to be confined"[7] had to be made before commitment was ordered. The release of such a person was wholly discretionary with the hospital authorities and the court could not interfere with their judgment. The criminal standard for confinement at a mental hospital, however, was concerned wholly with the danger which the release of an acquittee suffering from mental illness

---

[7] We do not construe the alternative, "or that he ought to be confined," as empowering the Probate Court to commit persons to mental hospitals for any reasons other than mental illness of such a nature that confinement is necessary.

would create for himself or the community without regard to whether he might be a "fit subject for treatment" at a mental hospital. Once he had been the subject of a criminal mittimus to a mental hospital, an acquittee could be released only with the approval of the court after affording the state an opportunity for a hearing upon the potential danger which such release involved. We must reject, therefore, the contention of the state that a criminal defendant acquitted by reason of insanity and ordered to be confined in a mental hospital pursuant to § 53a-47 is in the same position as a person civilly committed under § 17-178 who must bear the cost of his confinement. Unlike one whose mental illness has never been manifested by performing a criminal act but whose mental condition renders him a "fit subject for treatment," the focus of the inquiry with respect to the acquittee is upon the protection of the community, the same consideration which is of primary concern in relation to the imprisonment of persons convicted of crimes.

We must also decide whether those confined after an insanity acquittal, even though a significantly different class from those committed civilly, can be sufficiently distinguished from ordinary prisoners sentenced for crimes after conviction to justify a different treatment in regard to payment of hospital expenses. As the state points out, there are differences between those whose hospitalization occurs during the period of their incarceration in a prison and those confined pursuant to § 53a-47. The insanity acquittee does not bear the stigma associated with the conviction of a crime; he is under the jurisdiction of the commissioner of mental health rather than the commissioner of correction; and, most importantly, once his mental condition has improved to the extent, as determined by the court, that it would no longer be dangerous to release him, he cannot be denied his freeedom. The ordinary

prisoner, who is being punished for a crime, must serve the remainder of his term of imprisonment regardless of whether treatment for his mental condition has been successful. These differences, however, have no particular relevance to the propriety of requiring an insanity acquittee to pay for the same services which are provided to an ordinary prisoner without charge, because they are not related to comparative financial ability or need for treatment. During his period of confinement an acquittee has no greater earning capacity than his fellow hospital inmate temporarily removed from prison for treatment. We are not aware of any evidence that his financial prospects upon his court sanctioned release from a mental hospital are any brighter than those of an ordinary prisoner whose term of imprisonment has expired and who has also been treated for mental illness. Neither can we perceive any difference in the relative need for mental treatment between acquittees and other prisoners who have been transferred to an institution for such treatment. In sum, both classes of hospital inmates are being deprived of their liberty primarily for the protection of society; both have the same financial resources; and both have the same need for treatment. We are unable, therefore, to find any reasonable ground to support the imposition of charges for hospital services on one group of prisoners, pursuant to § 17-317, while another group is excused from such payment by § 17-318.

The state relies upon cases from other jurisdictions which have rejected claims of a denial of equal protection by insanity acquittees or, in some instances, pretrial detainees, who have been confined to mental hospitals and charged for the cost of such treatment. See *State* v. *Estate of Burnell,* 165 Colo. 205, 208–209, 439 P.2d 38, appeal dismissed, 393 U.S. 13, 89 S. Ct. 46, 21 L. Ed. 2d 13 (1968); *In re Estate of Schneider,* 50 Ill. 2d 152, 154–55, 277 N.E.2d 870 (1971); *Depart-*

*ment of Mental Health* v. *Pauling,* 47 Ill. 2d 269, 272, 265 N.E.2d 159 (1970); *In re Sargent,* 116 N.H. 77, 354 A.2d 404 (1976); *State* v. *Carter,* 64 N.J. 382, 316 A.2d 449 (1974); *State ex rel. Dorothea Dix Hospital* v. *Davis,* 232 S.E.2d 698 (N.C. 1977). In none of these cases, however, does it appear that the statutory criteria for commitment or release of persons confined by order of the criminal court differed from those applicable to civil commitments.

We recognize the principle that the legislature has a broad discretion in the exercise of its power to enact legislation and that its judgment in establishing statutory classifications will be set aside only where no grounds can be conceived to justify them. *McDonald* v. *Board of Election,* 394 U.S. 802, 809, 89 S. Ct. 1404, 22 L. Ed. 2d 739 (1969). The constitutional guaranty of equal protection of the laws, nevertheless, does preclude discriminations which are entirely arbitrary. *Smith* v. *Cahoon,* 283 U.S. 553, 566–67, 51 S. Ct. 582, 75 L. Ed. 1264 (1931). "The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal." *McDonald* v. *Board of Election,* supra.

The state contends that the legislative policy embodied in §§ 17-317 and 17-318 is to conserve state funds by making patients at state mental hospitals bear the expense of their confinement to the extent of their ability to pay. The exception created by § 17-318 for prisoners serving sentences, whether or not they are able to pay such costs, is not consistent with this policy and, therefore, can only be justified by different considerations. The state does not indicate what these other concerns may have been with respect to prisoners under sentence nor does it suggest any valid reason why they would not apply in equal measure to persons

532

held in custody pursuant to § 53a-47. We have concluded that its claim that the status of an insanity acquittee is not essentially different from that of a person civilly committed disregards reality. The further contention is equally unsound that the difference in liability for hospital care is justified by the circumstance that upon improvement in his mental condition an acquittee may apply for his release while an ordinary prisoner must return to jail to complete his sentence. This conceded difference in conditions for release has no relationship that we can discern to the comparative financial ability or the need for treatment of the two categories involved, nor to any other factor which might reasonably support the distinction the legislature has chosen to make by charging one but not the other.

We conclude that § 17-317, as well as § 53a-47 (h), in relation to § 17-318 deny equal protection of the laws to insanity acquittees like the defendant Scott Reed and declare them invalid as violating § 1 of the fourteenth amendment to our federal constitution and article first, § 20 of our state constitution.

There is error, the judgment is set aside and the case is remanded with direction to render judgment for the defendants.

In this opinion the other judges concurred.