******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

SEELEY, J., concurring. I agree with my colleagues that the judgment of the trial court granting the petition to continue the commitment of the acquittee, Franklin Foster, to the jurisdiction of the Psychiatric Security Review Board (board) should be affirmed.[1] I join part I of the majority opinion and its conclusion that the court properly found that the state had proven, by clear and convincing evidence, that the acquittee suffered from a mental illness resulting in his being a danger to himself or others. With respect to the acquittee's claim that General Statutes § 17a-593 (c),[2] as applied to him, violated his right to equal protection guaranteed by the federal constitution,[3] I am not persuaded that the acquittee is not similarly situated to civilly committed inmates.[4] Instead, I follow the well traveled analytical path established by prior decisions of our Supreme Court and this court and assume, without deciding, that the acquittee is similarly situated to civilly committed inmates for purposes of the equal protection analysis. I further conclude that rational basis review, not intermediate scrutiny, applies and that the acquittee failed to challenge the constitutionality of § 17a-593 (c) pursuant to this standard of review. Accordingly, the acquittee has not established that the court improperly denied his equal protection claim. I therefore respectfully concur in the judgment.

I begin by setting forth the background of the acquittee's constitutional claim. "[T]he concept of equal protection [under both the state and federal constitutions] has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. . . . Conversely, the equal protection clause places no restrictions on the state's authority to treat dissimilar persons in a dissimilar manner. . . . Thus, [t]o implicate the equal protection [clause] . . . it is necessary that the state statute . . . in question, either on its face or in practice, treat persons standing in the same relation to it differently. . . . [*Accordingly*], *the analytical predicate* [*of an equal protection claim*] *is a determination of who are the persons* [*purporting to be*] *similarly situated.* . . . The similarly situated inquiry focuses on whether the [plaintiff is] similarly situated to another group for purposes of the challenged government action. . . . Thus, [t]his initial inquiry is not whether persons are similarly situated for all purposes, but whether they are similarly situated for purposes of the law challenged." (Citations omitted; emphasis added; internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 157–58, 957 A.2d 407 (2008); see also *In re Taijha H.-B.*, 333 Conn. 297, 312–13, 216 A.3d 601 (2019). If the court determines that the two groups are similarly

situated, it then must apply the appropriate standard of review; rational basis,[5] intermediate scrutiny,[6] or strict scrutiny;[7] to determine whether the challenged statute is constitutional. *State* v. *Dyous*, 307 Conn. 299, 316–18, 53 A.3d 153 (2012).

As noted by the majority, the acquittee, in his motion to dismiss the state's petition for continued commitment, argued that the recommitment procedure applicable to acquittees violated his right to equal protection. The trial court denied the acquittee's motion to dismiss but did not address specifically whether the two classes were similarly situated. It also rejected the acquittee's assertion that intermediate scrutiny was the applicable standard for his claim. On appeal, the acquittee challenged, inter alia, "whether applying § 17a-593, authorizing continued commitment, to [the acquittee's] unique factual and legal posture, passes constitutional muster for federal equal protection purposes." Specifically, the acquittee contends that he was on conditional release for eighteen months, when a similarly situated class of civilly committed inmates would have been released by operation of law.[8] With regard to the initial determination of whether acquittees who have reached the maximum term of commitment are similarly situated to civilly committed inmates, the acquittee argues that these two groups have common features that render them similar with respect to § 17a-593 and that a prudent person would deem them to be roughly equivalent. Finally, the acquittee claims that intermediate scrutiny, not rational basis review, is the appropriate standard, and that, under intermediate scrutiny, the mandates of § 17a-593, as applied to him, do not bear a substantial relationship to an important government interest.

The state counters, inter alia, that the two groups are not similarly situated. Specifically, it contends that, although "acquittees and [civilly committed inmates] share similarities, because there is a direct nexus between acquittees' crimes and their mental illness, and because [acquittees] affirmatively proved not only that they were mentally ill but also that they were unable to understand their own criminality or control their behavior, acquittees are not similarly situated to [civilly committed inmates]. As such, the acquittee cannot satisfy the threshold determination underlying his equal protection claim." In his reply brief, the acquittee responds that acquittees and civilly committed inmates are similarly situated because (1) both groups have been subjected to involuntary commitment, a deprivation of liberty, (2) the purpose of the commitment is to treat the individual's mental illness and to protect the individual and society from his or her potential dangerousness, and (3) both groups have committed a crime beyond a reasonable doubt.

The majority, although acknowledging that this issue is "not necessarily clear cut," accepts the state's argu-

ment that the acquittee is not similarly situated to civilly committed inmates. Herein lies my point of deviation from the approach taken by my colleagues. Neither party has persuaded me regarding the initial determination of whether the two groups are similarly situated. Therefore, my approach to resolving the present appeal is to bypass this threshold question for equal protection claims and to follow the analytical path established by several decisions from both our Supreme Court and this court and assume, without deciding, that acquittees are similarly situated to civilly committed inmates. Next, I conclude that, pursuant to the binding precedent of our Supreme Court in *State* v. *Long*, 268 Conn. 508, 540, 847 A.2d 862 (*Long I*), cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004), rational basis review applies to the acquittee's equal protection claim. As a result of the acquittee's failure to adequately brief § 17a-593 (c) under that standard of review, his equal protection claim fails.

Our Supreme Court often has commenced an equal protection analysis "by [a]ssuming arguendo that the two categories of defendants identified by the [acquittee] are similarly situated with respect to the [statutory scheme] . . . ." (Internal quotation marks omitted.) *State* v. *Wright*, 246 Conn. 132, 143, 716 A.2d 870 (1998). More specifically, in equal protection challenges to § 17a-593, the appellate courts of this state repeatedly and consistently have assumed, without deciding, that acquittees are similarly situated to other groups of persons suffering from mental illness. See, e.g., *State* v. *Dyous*, supra, 307 Conn. 316; *State* v. *Long*, 301 Conn. 216, 233 n.17, 19 A.3d 1242, cert. denied, 565 U.S. 1084, 132 S. Ct. 827, 181 L. Ed. 2d 535 (2011); *State* v. *Long*, supra, 268 Conn. 535; *State* v. *Lindo*, 110 Conn. App. 418, 426, 955 A.2d 576, cert. denied, 289 Conn. 948, 960 A.2d 1038 (2008).

Next, I note our Supreme Court's observation that, "[a]s a matter of federal law, [i]t is clear that commitment for any purpose constitutes a significant deprivation of liberty . . . . The United States Supreme Court has recognized involuntary commitment to a mental institution, in particular, as involving more than a loss of freedom from confinement . . . due to its stigmatizing consequences, and the potential exposure to invasive, compulsory medical and psychiatric treatment." (Citations omitted; internal quotation marks omitted.) *State* v. *Metz*, 230 Conn. 400, 412–13, 645 A.2d 965 (1994); see also *State* v. *Long*, supra, 301 Conn. 238; S. Caspar & A. Joukov, "Worse than Punishment: How the Involuntary Commitment of Persons with Mental Illness Violates the United States Constitution," 47 Hastings Const. L.Q. 499, 532 (2020); A. Tsesis, "Due Process in Civil Commitments," 68 Wash. & Lee L. Rev. 253, 260 (2011).

Our appellate courts have considered equal protection claims to § 17a-593 on several occasions. In *State*

v. *Long*, supra, 268 Conn. 510, the acquittee challenged the constitutionality of statutory procedures pertaining to the recommitment of acquittees past the initial term of their commitment if the discharge would constitute a danger to an acquittee or to others. In *Long I*, the acquittee had been found not guilty by reason of mental disease or defect pursuant to General Statutes (Rev. to 1985) § 53a-13 (a) of assault in the second degree in violation of General Statutes (Rev. to 1985) § 53a-60. Id., 511. The court committed the acquittee to the jurisdiction of the board for a period of five years, which was equal to the maximum sentence of incarceration he could have received had he been convicted. Id., 512. The state successfully moved to extend the period of commitment on four occasions, resulting in the acquittee having been in the custody of the board for more than sixteen years at the time of his appeal. Id., 513.

At some point in 2001, the acquittee moved to strike the board's report to the court recommending his continued commitment and to dismiss the state's petition for recommitment. Id. Although the court initially denied the acquittee's motions, it sua sponte reconsidered its ruling and ultimately granted the acquittee's motions and vacated its order of commitment. Id., 513–14. The trial court concluded, inter alia, that § 17a-593 (c) violated the acquittee's federal constitutional right to equal protection "because [§ 17a-593 (c)] treats acquittees . . . differently from . . . civilly committed inmates . . . ." Id., 514.[9]

Our Supreme Court disagreed with the trial court and explained that, because a rational basis existed for treating acquittees differently from civilly committed inmates, the acquittee's equal protection claim failed. Id., 516–17. In its analysis, the court assumed, "without deciding, that acquittees are similarly situated to civilly committed inmates." Id., 535. Next, the court expressly held that § 17a-593 (c) neither affected a suspect group nor implicated a fundamental right, and, therefore, rational basis review applied. Id. Finally, the court identified two plausible policy reasons that supported the legislature's different treatment of acquittees and civilly committed inmates. Id., 536. "First, under the acquittee statutory scheme, the board has general and specific familiarity with all acquittees beginning with their initial commitment and, therefore, is better equipped than courts to monitor their commitment. By placing oversight of these individuals in a single administrative agency, such as the board, which is comprised of laypersons and experts in relevant areas, including psychiatry, psychology, probation, and victim advocacy, the legislature reasonably could have believed that the board, with its expertise and familiarity with the mental status of each acquittee, would be better equipped than a court to monitor the individuals' recommitment. This furthers the legislature's legitimate interest in efficiently manag-

ing the recommitment of acquittees." Id.

"Second, the state clearly has an interest in ensuring that its citizens are not erroneously committed based on harmless, idiosyncratic behavior. . . . The legislature, however, reasonably could have concluded that the risk of erroneous commitment is far less for an acquittee and, therefore, additional mandatory judicial review during the recommitment is unnecessary. Specifically, the legislature could have determined that the likelihood of an erroneous commitment is reduced in the case of an acquittee because an acquittee initiates the commitment process himself by pleading and proving the mental illness that led to his commission of a crime." (Citation omitted.) Id., 536–37. The court concluded that rational bases existed for the different treatment of acquittees and civilly committed inmates, and, therefore, the acquittee's right to equal protection was not violated. Id., 537.

In *State* v. *Lindo*, supra, 110 Conn. App. 420, the acquittee, during his commitment, pleaded guilty to stabbing a staff member and was sentenced to a period of two years of incarceration. He was transferred to a correctional institution to serve his sentence, and, during his incarceration, his commitment was extended for a period not to exceed five years. Id., 420–21. On appeal, the acquittee argued that "§ 17a-593 (c), as applied to him, violated his right to equal protection because at the time of the recommitment hearing . . . he was an inmate and therefore should have been afforded the more stringent procedural protections applicable when the state seeks to commit mentally ill prisoners pursuant to General Statutes § 17a-515." Id., 422.

This court noted that, in essence, the acquittee presented two claims. Id., 423. First, he argued that he was a mentally ill prisoner, rather than an acquittee, at the time of the recommitment hearing, and, as such, civil commitment statutes should have been applied to him. Id. Second, the acquittee contended that, even if he were an acquittee, he was similarly situated to mentally ill prisoners and had been treated in a manner different from that group when § 17a-593 (c) was applied to him instead of the civil commitment statutes applicable to mentally ill prisoners. Id. We rejected the acquittee's first claim, concluding that, pursuant to General Statutes § 17a-582 (h), an acquittee remains under the jurisdiction of the board until discharged. Id., 424. As to his second claim, this court assumed, without deciding, that acquittees were similarly situated to civilly committed inmates. Id., 426. Applying the reasoning set forth in *State* v. *Long*, supra, 268 Conn. 537, we concluded that "there are rational bases that justify the disparate treatment afforded acquittees as compared with that afforded mentally ill prisoners," and, thus, his equal protection claim failed. *State* v. *Lindo*, supra, 110 Conn.

App. 426–27.

In *State* v. *Dyous*, supra, 307 Conn. 301–302, our Supreme Court considered whether the disparities in the procedures for extending an acquittee's term of commitment as compared to the procedures for extending a civilly committed inmate violated the federal equal protection clause.[10] The defendant argued that intermediate scrutiny applied to his equal protection claim. Id., 303. Our Supreme Court concluded that it need not determine whether acquittees were similarly situated to civilly committed inmates or the appropriate standard of review because it agreed with the state that "§ 17a-593 would withstand intermediate scrutiny if such scrutiny were warranted." Id.

In its analysis, the court first recited the standards for determining if two groups were similarly situated for equal protection purposes: "[T]he concept of equal protection [under the federal constitution] has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. . . . Conversely, the equal protection clause places no restrictions on the state's authority to treat dissimilar persons in a dissimilar manner. . . . [Accordingly], the analytical predicate [of an equal protection claim] is a determination of who are the persons [purporting to be] similarly situated. . . . The similarly situated inquiry focuses on whether the [challenger is] similarly situated to another group for purposes of the challenged government action. . . . Thus, [t]his initial inquiry is not whether persons are similarly situated for all purposes, but whether they are similarly situated for purposes of the law challenged. . . . Entities are situated similarly in all relevant aspects if a prudent person, looking objectively at the incidents, would [deem] them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the relevant aspects are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." (Citation omitted; internal quotation marks omitted.) Id., 315–16.

The defendant asserted that both acquittees and civilly committed inmates had been proven guilty beyond a reasonable doubt to have engaged in criminal conduct, were currently mentally ill, required treatment, and presented a potential danger to society. Id., 316. The court acknowledged that the state's contention that the two groups were not similarly situated because only acquittees were mentally ill at the time of the criminal conduct and had engaged in such conduct because of their mental illness had "some persuasive force . . . ." Id. It also rejected the conclusion of the concurring opinion that acquittees and civilly committed inmates

are not similarly situated, by stating that the initial inquiry of similarly situated *was not "nearly so clear cut in light of the important features that the two groups have in common."* (Emphasis added.) Id., 316 n.11. Ultimately, the court assumed, without deciding, that the groups were similarly situated. Id., 316.

With respect to the issue of the standard of review, our Supreme Court noted that the defendant argued that intermediate scrutiny applied because the recommitment of an acquittee constituted a "massive curtailment of . . . liberty"; (internal quotation marks omitted) id., 318; and that two decisions[11] of the United States Court of Appeals for the Second Circuit had applied that standard in reviewing a New York statute. Id., 318–20. Although inclined "to agree with the defendant that the balance of persuasive authority favors applying intermediate scrutiny to § 17a-593," the court ultimately concluded that it need not identify the proper standard of review because the statute withstood intermediate scrutiny.[12] Id., 321–22.

Prior to applying intermediate scrutiny, our Supreme Court first noted the different statutory goals of the protection of society with respect to General Statutes (Rev. to 2011) § 17a-593 (g) and consideration of the least restrictive placement with respect to General Statutes § 17a-498 (c). Id., 323. Next, the court explained that the board, an administrative body composed of individuals from various disciplines and whose purpose is "to manage, monitor and review the status of each acquittee to ensure the protection of the general public," has no civil counterpart. (Internal quotation marks omitted.) Id., 324. These disparities served to tip the balance in favor of confinement with respect to acquittees and in favor of protecting the individual liberty of civilly committed inmates. Id., 325.

The court then noted the important government interests of protecting society and affording proper psychiatric treatment to acquittees. Id., 326. It also determined that the recommitment procedure substantially related to the goal of protecting society. Id., 327. As the court explained: "[S]omeone whose mental illness was sufficient to lead him to commit a dangerous crime, and whose mental illness demonstrably has persisted despite years of intensive treatment, is someone whose prospective release raises a special concern for public safety. That concern plainly is not present to the same degree in the case of a civilly committed inmate, a person who (1) might not have been mentally ill when he committed his crime, (2) might not suffer from a long-standing mental illness that has persisted despite years of intensive treatment, and (3) was not legally adjudicated to have committed a crime as a result of his mental illness." (Internal quotation marks omitted.) Id., 329. The court also concluded that a logical connection existed between this special concern and the

recommitment procedure and that this procedure did not impose too great a burden on the individual liberty of acquittees. Id., 332–33.[13]

Decisions from the United States Supreme Court have suggested strongly that acquittees are similarly situated to civilly committed inmates.[14] For example, in *Baxstrom* v. *Herold*, 383 U.S. 107, 108, 86 S. Ct. 760, 15 L. Ed. 2d 620 (1966), the petitioner was sentenced to a period of incarceration, during which a prison physician certified him as insane. He then was transferred to a facility for the purpose of confining and caring for mentally ill prisoners. Id. The director of this facility filed a petition stating that the petitioner's sentence was about to terminate and requested that he be civilly committed pursuant to New York law. Id. On the date that the petitioner's period of incarceration ended, custody over him shifted from the Department of Correction to the Department of Mental Hygiene, although he remained confined in the same facility for mentally ill prisoners. Id., 109. The United States Supreme Court held that the petitioner "was denied equal protection of the laws by the statutory procedure under which a person may be civilly committed at the expiration of his penal sentence without the jury review available to all other persons civilly committed in New York. Petitioner was further denied equal protection of the laws by his civil commitment to an institution maintained by the Department of Correction beyond the expiration of his prison term without a judicial determination that he is dangerously mentally ill such as that afforded to all so committed except those . . . nearing the expiration of a penal sentence." Id., 110.

The Supreme Court rejected the respondent's argument that those individuals nearing the end of their criminal sentence who might be mentally ill and in need of being civilly committed were not similarly situated to those not nearing the end of a prison term. Id., 111–12. "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." Id., 111. The court also rejected the respondent's argument that persons such as the petitioner had proven criminal tendencies as shown by their convictions. Id., 114. "Where the [s]tate has provided for a judicial proceeding to determine the dangerous propensities of all others civilly committed to an institution of the Department of Correction, it may not deny this right to a person in [the petitioner's] position solely on the ground that he was nearing the expiration of a prison term. . . . All others receive a judicial hearing on this issue [of whether the petitioner was presently mentally ill and posed such a danger to others as to warrant confinement in Department of Correction facility]. Equal protection demands that [the petitioner] receive the same." (Footnote omitted.) Id., 114–15.

In *Jackson* v. *Indiana*, 406 U.S. 715, 717, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972), the petitioner, a "deaf mute with a mental level of a pre-school child," was charged with two separate robberies. He was determined to be incompetent to stand trial and the trial court committed him to the Indiana Department of Mental Health until his competency was restored. Id., 719. The petitioner's counsel moved for a new trial, arguing that the court's order amounted to the imposition of a life sentence without ever being convicted of a crime. Id.

On appeal to the United States Supreme Court, the petitioner claimed that he had been denied equal protection because, in the absence of the criminal charges pending against him, the state would have been required to utilize "either the commitment procedures for feeble-minded persons, or those for mentally ill persons." Id., 723. The petitioner argued that "under [the] statutes [that provided for such commitment procedures] (1) the decision whether to commit would have been made according to a different standard, (2) if commitment were warranted, applicable standards for release would have been more lenient, (3) if committed under [one of the statutes], he could have been assigned to a special institution affording appropriate care, and (4) he would then have been entitled to certain privileges not now available to him." Id.

The Supreme Court first reviewed its decision in *Baxstrom* v. *Herold*, supra, 383 U.S. 107, and noted that, if a criminal conviction and the imposition of a sentence were insufficient to justify less substantive and procedural protections against indefinite commitment than those generally available, the filing of criminal charges also could not suffice. *Jackson* v. *Indiana*, supra, 406 U.S. 724. It expressly noted that the "*Baxstrom principle also has been extended to commitment following an insanity acquittal . . . .*" (Citations omitted; emphasis added.) Id., 724–25.[15] Later, it explained that *Baxstrom* "held that the [s]tate cannot withhold from a few the procedural protections or the substantive requirements for commitment that are available to all others." Id., 727; see, e.g., B. Wendzel, note, "Not Guilty, Yet Continuously Confined: Reforming the Insanity Defense," 57 Am. Crim. L. Rev. 391, 397–98 (2020) (discussing "*Baxstrom-Jackson* equal protection doctrine"). Ultimately, the court concluded that subjecting the acquittee "to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses . . . deprived [him] of equal protection of the laws under the [f]ourteenth [a]mendment." *Jackson* v. *Indiana*, supra, 730; cf. *Jones* v. *United States*, 463 U.S. 354, 368–70, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983) (noting that purpose of commitment following insanity acquittal is treatment and protection of society, not punishment of acquittee, in contrast to sentence of incarceration,

which is based on considerations such as retribution, deterrence and rehabilitation, and no correlation exists between severity of offense and length of time necessary for recovery of acquittee; therefore, due process clause permits government to confine acquittee to mental institution until such time as he or she has regained sanity or is no longer danger to himself or herself or society).[16] As demonstrated by these cases, the issue of whether acquittees are similarly situated to civilly committed inmates presents a complicated inquiry that courts often bypass in order to address the merits of an equal protection claim.

The state argues that the existence of a nexus between the acquittee's mental illness and his criminal conduct, and the requirement that an acquittee affirmatively prove the defense of not guilty by reason of mental disease or defect, establishes that he is not similarly situated to civilly committed inmates. These arguments, although not without some persuasive force, do not convince me that we should reach a conclusive determination regarding this issue. Given the existing case law from both our state and federal courts, and my concern for the rights of individuals such as the acquittee, who has been committed to the custody of the board since April 2, 2003, approximately twenty years, which is twice as long as his ten year maximum period of incarceration,[17] I would follow the lead of our Supreme Court, and a panel of this court, and continue to assume, without deciding, that the acquittee is similarly situated to civilly committed inmates to consider the merits of his equal protection claim.

With respect to the applicable standard of review, "[i]t is axiomatic that, as an intermediate appellate tribunal, this court is not free to depart from or modify the precedent of our Supreme Court." *Davis* v. *Davis-Henriques*, 163 Conn. App. 301, 312, 135 A.3d 1247 (2016); see also *State* v. *Gonzalez*, 214 Conn. App. 511, 522–23 n.10, 281 A.3d 501 (This court noted: "[W]e are not at liberty to overrule or discard the decisions of our Supreme Court but are bound by them. . . . [I]t is not within our province to reevaluate or replace those decisions." (Internal quotation marks omitted.)), cert. denied, 345 Conn. 967, 285 A.3d 736 (2022). In *State* v. *Long*, supra, 268 Conn. 535, our Supreme Court expressly held that rational basis review applied to an equal protection challenge to § 17a-593 (c). See also *State* v. *Long*, supra, 301 Conn. 243 (issue of whether intermediate scrutiny applies to equal protection challenge to § 17a-593 (c) may be revisited at some point).

Furthermore, it is well established that "one panel of this court cannot overrule the precedent established by a previous panel's holding. . . . As we have often stated, this court's policy dictates that one panel should not, on its own, [overrule] the ruling of a previous panel. [That] may be accomplished only if the appeal is heard

en banc. . . . Prudence, then, dictates that this panel decline to revisit such requests." (Internal quotation marks omitted.) *State* v. *Gonzalez*, supra, 214 Conn. App. 524. In *State* v. *Lindo*, supra, 110 Conn. App. 425, this court specifically rejected the claim that intermediate scrutiny applied to an equal protection challenge to § 17a-593 (c).[18] Our precedent makes clear that § 17a-593 (c) must be analyzed under rational basis review.

The acquittee argues in his appellate brief that the court erred in refusing to apply intermediate scrutiny to the acquittee's claim of disparate treatment in statutory recommitment procedures for acquittees as compared to civilly committed inmates. He then provides a lengthy analysis that focuses on whether the relevant statutory framework passes constitutional muster under the lens of intermediate scrutiny. I am not persuaded by the acquittee's efforts to distinguish the present case from *State* v. *Long*, supra, 268 Conn. 535–36. Instead, I am bound to apply rational basis review to the acquittee's claim of disparate treatment in statutory recommitment procedures for acquittees as compared to civilly committed inmates. An intermediate court must follow the precedent of our Supreme Court, which presently requires § 17a-593 (c), for purposes of a federal equal protection challenge, to be "analyzed under rational basis review." *State* v. *Long*, supra, 268 Conn. 535.[19]

The acquittee, however, has failed to adequately brief the claim that his right to equal protection had been violated under rational basis review. As noted, his appellate brief focuses on why § 17a-593 (c), as applied to him, does not survive intermediate scrutiny. There is, however, no cogent analysis or discussion of whether § 17a-593 (c) passes review under the rational basis standard. "[W]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (Internal quotation marks omitted.) *State* v. *Fetscher*, 162 Conn. App. 145, 155–56, 130 A.3d 892 (2015), cert. denied, 321 Conn. 904, 138 A.3d 280 (2016). As a result, his equal protection claim raised before this court must fail.

For the foregoing reasons, I respectfully concur.

[1] After an acquittee has proven the defense of mental disease or defect,

he or she may be committed to the jurisdiction of the board for a maximum term of commitment not to exceed the maximum sentence that could have been imposed had that individual been convicted. See General Statutes § 17a-582; see also *State* v. *Long*, 268 Conn. 508, 519, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004). The board is an administrative body consisting of six members, a psychiatrist, a psychologist, a probation expert, a layperson, an attorney who is a member of the state bar, and a layperson with experience in victim advocacy. General Statutes § 17a-581 (b). "The purpose of the board is to manage, monitor and review the status of each acquittee to ensure the protection of the general public." *State* v. *Long*, supra, 520; see also General Statutes § 17a-584. The state may file a petition to extend the maximum term of commitment if reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities and would constitute a danger to others or himself or herself. *State* v. *Long*, supra, 520; see also General Statutes § 17a-593 (c).

[2] General Statutes § 17a-593 (c) provides: "If reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities or a person with intellectual disability to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others, the state's attorney, at least one hundred thirty-five days prior to such expiration, may petition the court for an order of continued commitment of the acquittee." See also *State* v. *Dyous*, 307 Conn. 299, 307, 53 A.3d 153 (2012).

[3] The fourteenth amendment to the United States constitution provides in relevant part that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1.

[4] In his reply brief, the acquittee asserts that he relied on the following definition of civilly committed inmates from *State* v. *Dyous*, 307 Conn. 299, 301, 53 A.3d 153 (2012): "[M]entally ill, convicted defendants who were transferred, pursuant to General Statutes §§ 17a-498 and 17a-515, to a psychiatric facility while they were serving their sentences, and whom the state seeks to commit to a similar institution after their sentences end." (Footnote omitted.) "[C]ivil commitment generally is an involuntary process, initiated by someone other than the committee" and "any person may file an application for the civil commitment of an individual with the Probate Court . . . ." *State* v. *Long*, 268 Conn. 508, 528–29, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004); see also General Statutes § 17a-497 (a). Furthermore, after civil commitment proceedings are commenced, the individual who is the subject of the proceedings, including an inmate in the prison system, has a right to a hearing on the merits before the Probate Court. General Statutes § 17a-498 (a).

General Statutes § 17a-498 (c) (3) provides in relevant part: "If the [Probate] [C]ourt finds by clear and convincing evidence that the respondent has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, the court shall make an order for his or her commitment, considering whether or not a less restrictive placement is available, to a hospital for psychiatric disabilities to be named in such order, there to be confined for the period of the duration of such psychiatric disabilities or until he or she is discharged or converted to voluntary status pursuant to section 17a-506 in due course of law. . . ."

General Statutes § 17a-515 provides: "The provisions of section 17a-498 shall apply to any person regarding whom proceedings for commitment are being instituted under section 17a-513 or 17a-514, and to any other person in the custody of the Commissioner of Correction, except that if the [Probate] [C]ourt revokes the order of commitment, the person shall be returned to any institution administered by the Department of Correction as the Commissioner of Correction shall designate, unless his custody in the Commissioner of Correction has terminated, in which case he shall be discharged."

[5] Rational basis review is the most deferential standard. *State* v. *Dyous*, 307 Conn. 299, 317, 53 A.3d 153 (2012). "[Our Supreme Court] has held, in accordance with the federal constitutional framework of analysis, that in areas of social and economic policy that neither proceed along suspect lines nor infringe fundamental constitutional rights, the [e]qual [p]rotection [c]lause is satisfied [as] long as there is a plausible policy reason for the classification . . . the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker . . . and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational . . . ."

(Citations omitted; internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 158–59. "A party challenging a law under rational basis review bears the burden of proving that the law's class-based distinctions are wholly irrational." *State* v. *Dyous*, supra, 317.

[6] "[F]or purposes of federal equal protection analysis, the United States Supreme Court also has developed an intermediate level of scrutiny that lies [b]etween [the] extremes of rational basis review and strict scrutiny. . . . Intermediate scrutiny typically is used to review laws that employ quasi-suspect classifications . . . such as gender . . . or [il]legitimacy . . . . On occasion intermediate scrutiny has been applied to review of a law that affects an important, though not constitutional, right. . . . Under intermediate scrutiny, the government must show that the challenged legislative enactment is substantially related to an important governmental interest." (Citations omitted; internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 160.

[7] "The least deferential standard of review is strict scrutiny, which applies both to laws that discriminate on the basis of a person's membership in a suspect class and to laws that burden a person's exercise of a fundamental right." *State* v. *Dyous*, 307 Conn. 299, 317, 53 A.3d 153 (2012). "Under that heightened standard, the state must demonstrate that the challenged statute is necessary to the achievement of a compelling state interest." (Internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 159.

[8] In *State* v. *Dyous*, supra, 307 Conn. 301, our Supreme Court explained that "[t]he procedure for extending an insanity acquittee's term of commitment to the [board] imposes greater burdens on individual liberty than does the civil commitment procedure appliable to civilly committed inmates . . . ." (Footnote omitted.) In its opinion, the court reviewed "the key disparities between the system applicable to insanity acquittees and the system applicable to civilly committed inmates. These disparities cause the system applicable to insanity acquittees to tilt more strongly toward confinement. In the most general terms, the system applicable to insanity acquittees, which is administered by the board and the Superior Court, operates such that its primary purpose is to protect the public, whereas the system applicable to civilly committed inmates, which is administered by mental health facilities and the Probate Court, operates such that a paramount concern is to protect a defendant's liberty.

"This difference in fundamental purpose yields specific disparities in standards, procedures and treatment conditions. Foremost among them is the fact that the legal standard for recommitting an insanity acquittee to the jurisdiction of the board is generally interpreted and applied more conservatively than is the legal standard for recommitting a civilly committed inmate, even though the two standards nominally are identical. This disparity is on display in the present case, the parties having stipulated at the defendant's recommitment hearing that, absent objection, the board's consulting psychiatrist and the defendant's retained psychiatrist both would have testified that the defendant did not meet the standard for involuntary civil commitment." Id., 322–23.

The court further reasoned that the legislature imposed different mandates on the two systems. Id., 323. With respect to acquittees, the primary concern for the board is consideration of public safety. Id. As to civilly committed inmates, physicians providing opinions to the Probate Court must consider whether a less restrictive placement should be recommended and is available. Id.

[9] The trial court also concluded that the acquittee's due process rights under article first, § 8, of the Connecticut constitution had been violated because § 17a-593 (c) failed to provide him with mandatory periodic judicial review of confinement. *State* v. *Long*, supra, 268 Conn. 514. Our Supreme Court rejected the trial court's conclusion and determined that the "existing statutory procedures, as applied to the [acquittee], did not expose him to an unreasonable risk of erroneous deprivation of his liberty." Id., 527. As a result, the acquittee's due process rights under our state constitution were not violated. Id.

[10] "Among other disparities between the two commitment schemes, the procedure for recommitting insanity acquittees directs the finder of fact to '[consider] that its primary concern is the protection of society'; General Statutes [Rev. to 2011] § 17a-593 (g); whereas the procedure for recommitting civilly committed inmates directs the finder of fact to '[consider] whether . . . a less restrictive placement is available . . . .' General Statutes § 17a-498 (c)." *State* v. *Dyous*, supra, 307 Conn. 301.

General Statutes § 17a-593 (g), pertaining to acquittees, provides: "The court shall make a finding as to the mental condition of the acquittee and, considering that its primary concern is the protection of society and its secondary concern is the safety and well-being of the acquittee, make one of the following orders: (1) If the court finds that the acquittee is not a person who should be discharged, the court shall order the recommendation or application for discharge be dismissed; or (2) if the court finds that the acquittee is a person who should be discharged, the court shall order the acquittee discharged from custody. The court shall send a copy of such finding and order to the board."

I note that, in 2022, the legislature added the phrase "and its secondary concern is the safety and well-being of the acquittee" to subsection (g) of § 17a-593. See Public Acts 2022, No. 22-45, § 5.

General Statutes § 17a-498 (c), pertaining to civilly committed inmates, provides: "(1) The court shall require the certificates, signed under penalty of false statement, of at least two impartial physicians selected by the court, one of whom shall be a practicing psychiatrist, and each of whom shall be licensed to practice medicine in the state of Connecticut and shall have been a practitioner of medicine for at least one year and shall not be connected with the hospital for psychiatric disabilities to which the application is being made, or related by blood or marriage to the applicant, or to the respondent. Such certificates shall indicate that the physicians have personally examined the respondent not more than ten days prior to such hearing. The court shall appoint such physicians from a list of physicians and psychiatrists provided by the Commissioner of Mental Health and Addiction Services and such appointments shall be made in accordance with regulations promulgated by the Probate Court Administrator in accordance with section 45a-77. Each such physician shall make a report on a separate form provided for that purpose by the Probate Court Administrator and shall answer such questions as may be set forth on such form as fully and completely as reasonably possible. Such form shall include, but not be limited to, questions relating to the specific psychiatric disabilities alleged, whether or not the respondent is dangerous to himself or herself or others, whether or not such illness has resulted or will result in serious disruption of the respondent's mental and behavioral functioning, whether or not hospital treatment is both necessary and available, whether or not less restrictive placement is recommended and available and whether or not the respondent is incapable of understanding the need to accept the recommended treatment on a voluntary basis. Each such physician shall state upon the form the reasons for his or her opinions. Such respondent or his or her counsel shall have the right to present evidence and cross-examine witnesses who testify at any hearing on the application. If such respondent notifies the court not less than three days before the hearing that he or she wishes to cross-examine the examining physicians, the court shall order such physicians to appear.

"(2) The court shall cause a recording of the testimony of such hearing to be made, to be transcribed only in the event of an appeal from the decree rendered under this section. A copy of such transcript shall be furnished without charge to any appellant whom the Probate Court finds unable to pay for such copy. The cost of such transcript shall be paid from funds appropriated to the Judicial Department.

"(3) If the court finds by clear and convincing evidence that the respondent has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, the court shall make an order for his or her commitment, considering whether or not a less restrictive placement is available, to a hospital for psychiatric disabilities to be named in such order, there to be confined for the period of the duration of such psychiatric disabilities or until he or she is discharged or converted to voluntary status pursuant to section 17a-506 in due course of law. Such court order shall further command some suitable person to convey such person to such hospital for psychiatric disabilities and deliver him or her, with a copy of such order and of such certificates, to the keeper thereof. In appointing a person to execute such order, the court shall give preference to a near relative or friend of the person with psychiatric disabilities, so far as the court deems it practicable and judicious. Notice of any action taken by the court shall be given to the respondent and his or her attorney, if any, in such manner as the court concludes would be appropriate under the circumstances."

[11] See *Ernst J.* v. *Stone*, 452 F.3d 186, 200 (2d Cir. 2006); *Francis S.* v. *Stone*, 221 F.3d 100, 111–12 (2d Cir. 2000).

[12] The court further noted that, because it did not determine the appro-

priate standard of review, it was unnecessary to consider whether its prior decision in *State* v. *Long*, supra, 268 Conn. 535, in which the court held that a federal equal protection challenge to § 17a-593 (c) must be analyzed under rational basis review, would preclude the court from determining that § 17a-593 (c) actually warrants intermediate scrutiny. *State* v. *Dyous*, supra, 307 Conn. 322 n.14.

[13] Additionally, our Supreme Court has determined that acquittees are similarly situated to civilly committed inmates for purposes of paying hospital expenses. *State* v. *Reed*, 192 Conn. 520, 529–30, 473 A.2d 775 (1984). "The insanity acquittee does not bear the stigma associated with the conviction of a crime; he is under the jurisdiction of the [C]ommissioner of [M]ental [H]ealth rather than the [C]ommissioner of [C]orrection; and, most importantly, once his mental condition has improved to the extent, as determined by the court, that it would no longer be dangerous to release him, he cannot be denied his freedom. The ordinary prisoner, who is being punished for a crime, must serve the remainder of his term of imprisonment regardless of whether treatment for his mental condition has been successful. These differences, however, have no particular relevance to the propriety of requiring an insanity acquittee to pay for the same services which are provided to an ordinary prisoner without charge, because they are not related to comparative financial ability or need for treatment. During his period of confinement an acquittee has no greater earning capacity than his fellow hospital inmate temporarily removed from prison for treatment. We are not aware of any evidence that his financial prospects upon his court sanctioned release from a mental hospital are any brighter than those of an ordinary prisoner whose term of imprisonment has expired and who has also been treated for mental illness. Neither can we perceive any difference in the relative need for mental treatment between acquittees and other prisoners who have been transferred to an institution for such treatment. In sum, both classes of hospital inmates are being deprived of their liberty primarily for the protection of society; both have the same financial resources; and both have the same need for treatment." Id.

[14] One commentator has indicated that "[w]hether an insanity acquittee's equal protection rights have been violated by state commitment proceedings has never been fully addressed by the [United States] Supreme Court." R. Dallet, note, "*Foucha* v. *Louisiana*: The Danger of Commitment Based on Dangerousness," 44 Case W. Res. L. Rev. 157, 163 (1993).

[15] See, e.g., *United States* v. *Ecker*, 543 F.2d 178, 188 n.34 (D.C. Cir. 1976) ("we recognize that equal protection requires the standards governing the release of criminal acquittees, who have been confined for a period equal to the maximum sentence authorized for their crimes, to be substantially the same as the standards applicable to civil committees"), cert. denied, 429 U.S. 1063, 97 S. Ct. 788, 50 L. Ed. 2d 779 (1977); *Bolton* v. *Harris*, 395 F.2d 642, 649 (D.C. Cir. 1968) ("[i]t follows that there is no reasonable basis for distinction for commitment purposes between those who plead insanity and those who have the defense thrust upon them"); *Cameron* v. *Mullen*, 387 F.2d 193, 201 (D.C. Cir. 1967) ("*Baxstrom* thus might be said to require the conclusion that, while prior criminal conduct is relevant to the determination whether a person is mentally ill and dangerous, it cannot justify denial of procedural safeguards for that determination"); *People* v. *Lally*, 19 N.Y.2d 27, 35, 224 N.E.2d 87, 277 N.Y.S.2d 654 (1966) (to comply with spirit, if not express language of *Baxstrom*, acquittee must be afforded all protections afforded to civilly committed individuals). Simply stated, it has been recognized that "*after the expiration of the period for which an acquittee might have been incarcerated had he been convicted, it may be irrational, within the meaning of equal protection doctrine, to distinguish between an acquittee and a committee.* Acquittees who have been confined for that period, therefore, may be entitled to treatment no different from that afforded committees." (Emphasis added.) *Waite* v. *Jacobs*, 475 F.2d 392, 395 (D.C. Cir. 1973); see also B. Wendzel, note, "Not Guilty, Yet Continuously Confined: Reforming the Insanity Defense," 57 Am. Crim. L. Rev. 391, 404 (2020) (disparity in procedural protections for acquittees as compared to those for civil commitments is less justifiable once acquittee has "served their penal sentence").

[16] In *State* v. *Dyous*, supra, 307 Conn. 316–17 n.11, the majority specifically distinguished the due process analysis set forth in *Jones* v. *United States*, supra, 463 U.S. 354, from its equal protection analysis. "The court in *Jones* merely determined that the distinctions between the two classes were sufficient to warrant differential treatment . . . the very same conclusion that we reach in the present case. Moreover, in *Jones*, the court expressly

observed that its due process analysis was dispositive of the equal protection claims that the petitioner had raised at an earlier stage of the proceedings, without suggesting that those claims failed to establish the threshold requirement that the classes must be similarly situated. . . . Indeed, with respect to the one equal protection argument that the petitioner did raise in *Jones*, the court addressed and rejected it on the merits, apparently assuming that the two classes are similarly situated. . . . It may be argued, therefore, that *Jones* supports the view that the two classes are similarly situated for equal protection purposes. *We do not believe, however, that Jones sheds any real light on the issue*." (Citations omitted; emphasis altered.) *State* v. *Dyous*, supra, 316–17 n.11.

[17] As our Supreme Court has noted, although the purpose of an order of commitment differs significantly from the imposition of a criminal sentence, the effect of commitment is no less a deprivation of liberty. *Connelly* v. *Commissioner of Correction*, 258 Conn. 394, 405, 780 A.2d 903 (2001).

[18] I note that, in *State* v. *Long*, supra, 301 Conn. 235, the acquittee conceded that rational basis review applied to his federal equal protection claim in his prior appeal. There was no such concession in *State* v. *Lindo*, supra, 110 Conn. App. 425.

[19] In *State* v. *Dyous*, supra, 307 Conn. 322, our Supreme Court indicated that "the balance of persuasive authority favors applying intermediate scrutiny to § 17a-593 . . . ." Furthermore, the *Dyous* court signaled that it was critical of the application of rational basis review in *Long I*. The court stated: "Because we do not determine the appropriate standard of review, we need not consider whether our use of rational basis review in *Long I*, in which we stated conclusorily that '§ 17a-593 (c) neither affects a suspect group nor implicates a fundamental right for . . . purposes of the federal equal protection clause' and, therefore, 'must be analyzed under rational basis review'; *State* v. *Long*, supra, 268 Conn. 535; would preclude us from determining that § 17a-593 actually warrants intermediate scrutiny." *State* v. *Dyous*, supra, 322 n.14.